COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Humphreys
Argued at Richmond, Virginia


DAVID W. FOGG
                                    MEMORANDUM OPINION* BY
v.    Record No. 3062-00-2          JUDGE JAMES W. BENTON, JR.
                                         MAY 28, 2002
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    James B. Wilkinson, Judge

          Carolyn V. Grady (Epperly, Follis & Schork,
          P.C., on brief), for appellant.

          Linwood T. Wells, Jr., Assistant Attorney
          General (Randolph A. Beales, Attorney General
          on brief), for appellee.


     A jury convicted David W. Fogg of second-degree murder and

use of a firearm in the commission of that murder.  Fogg contends

the trial judge erred in (i) limiting his attorney's

cross-examination of adverse witnesses and (ii) instructing the

jury on modus operandi.  For the following reasons, we reverse

Fogg's convictions and remand for a new trial.

                                I.

     The indictment alleged that David Fogg murdered Darryl

Adkins in the first degree in violation of Code § 18.2-32.  At

trial, the evidence proved Darryl Adkins was killed by a gunshot

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

on October 20, 1998, when he left a residence on Wainwright Drive after 11:00 p.m.

The trial evidence was based in significant part on the testimony of convicted felons. Joseph Rouse testified for the Commonwealth that on October 20, 1998 he was at Fogg's home when Fogg said Adkins owed Fogg money. Rouse testified Fogg was angry and said he "was . . . going to try to look [Adkins] up." Rouse also testified that Vernon Ripley was at Fogg's home on October 20, that Ripley used his car several times that day because Ripley's car was in disrepair, and that Ripley also asked to use Rouse's car so that he could find Adkins.

Rouse admitted he had been a drug dealer and testified that on October 20 he was on probation for committing felonies and was wanted by law enforcement because he had violated probation. He also testified that he was high on cocaine most of the day. Rouse spoke to the police about Adkins's murder after he was arrested on an unrelated offense on January 3, 1999. Although Rouse testified that the Commonwealth had not offered him any help or made any promises, he testified that he wanted some help "[i]f somebody will give him some help," that he had been convicted of three or four felonies, and that he also had charges that were pending. The prosecutor stipulated that the Commonwealth's Attorney had telephoned the Commonwealth's Attorney in Chesterfield County and informed him that Rouse would be testifying as its witness in this murder trial.

-

William Hagy testified he had known Fogg for approximately three and a half years and that he would go to Fogg's home to "sit around and smoke crack" with Fogg. He testified he and his brother, James Hagy, went to Fogg's home on the night of October 20 to buy cocaine. He recalled that Fogg, Ripley, Barry McGee, and Wendy Bright were at Fogg's home that night and that Fogg was "arguing, bickering" with someone on the phone, saying he wanted his money. When Fogg asked him to drive Ripley someplace, he declined because Ripley had a gun. He described Ripley as "a strong man," who "collected money for [Fogg] if somebody owed him money." Later, he heard Fogg tell Bright and Ripley "to go take care of what they had to take care of." When he and his brother left the house about 11:40 p.m., Ripley and Bright departed in the direction of Wainright Drive, with Bright driving. He testified that when he returned to Fogg's home the following day, Bright was there. Fogg remarked that "his boy took care of his job."

When asked by the prosecutor whether the Commonwealth had done anything for him, he responded, "no, sir." He testified, however, that he did expect some help with his sentences and admitted, on cross-examination, that he had been convicted of nineteen felonies. Fogg's attorney introduced a letter written by the prosecutor to Commonwealth's Attorneys in ten jurisdictions indicating that both William and James Hagy were cooperating in the murder prosecution and asking for

-

"consideration in [the] ultimate dispositions" of their pending charges. Fogg's attorney also introduced a letter William Hagy had written to the prosecutor expressing his concern about "what is happening with getting [his prison sentences] reconsidered to be run concurrent" and indicating his understanding that a judge could not reconsider his sentence after he is sent from jail to the penitentiary. When asked whether his cases had been delayed, he answered, "No. I have a whole bunch of cases." He further admitted he was serving sentences of approximately fifty years and that he had cases pending in Essex, King William, Gloucester, Charlottesville, Powhatan, and Richmond.

When Fogg's attorney asked if his two bad check charges were dismissed after testifying before the grand jury, the prosecutor objected. The trial judge ruled that, if the evidence did not show the charges were dismissed by an agreement, the inquiry was improper. In response to the judge's question whether he had an agreement that the prosecutor would dismiss those cases if he testified, Hagy responded "no, sir." The judge sustained the objection.

James Hagy testified that on October 20 he heard Fogg on the telephone yelling at "Darryl" that "he had to have his money." He testified that shortly after the telephone conversation ended, Fogg told Ripley, "ya'll go take care of that." He testified that he and his brother refused to take Ripley in their vehicle because they "wanted to go smoke [their]

-

crack" and because Ripley was "the enforcer" who collected money for Fogg. He testified that Bright was at Fogg's house when he returned the next day and she looked scared. He also testified that Fogg remarked that his "boy did his job" and that months later, while in jail, Fogg remarked again that Ripley had "done his job."

James Hagy also testified that the Commonwealth had promised him "[a]bsolutely nothing." He testified, however, that he was "hoping" for help. He admitted that he has been convicted of twelve felonies and fourteen misdemeanors involving lying, cheating, or stealing. When Fogg's attorney sought to question him about cases that were dismissed and continued and charges that were reduced after he testified before the grand jury, the prosecutor objected and argued that Fogg's attorney could not establish "the fact that [the prosecutors] were involved in any of the charges." The judge again ruled that Fogg's counsel first must establish a promise was made.

Barry McGee testified that he and Adkins were best friends and that they often went to Fogg's house to use cocaine. On the afternoon of October 20, he telephoned Adkins from Fogg's house and informed him that Fogg wanted to be paid immediately. He testified that when Fogg joined that conversation and angrily said he wanted his money, Adkins said he would pay Fogg later that day. McGee testified he left Fogg's house, found Adkins, and warned him to pay Fogg. McGee testified that he returned to

-

Fogg's home later that evening and told Fogg that Adkins was around the corner and was coming to pay the money.  Later, he heard Fogg say to Ripley and Bright "go ahead and take care of that."  McGee testified that Ripley, who was Fogg's "collector" and "somebody not to mess around with," departed with Bright in the direction of Wainwright Drive.  They left in a sport utility vehicle at the same time the Hagy brothers left in a sport utility vehicle.  He testified that he saw Bright at Fogg's home the next morning and that she was "real nervous, hysterical, crying, something is really wrong."

McGee testified that he was arrested two months after Adkins's murder for a cocaine offense and admitted that he had been convicted of felonies related to drug use.  He spoke with the police about Adkins's murder in April of 1999 after he was arrested for a second cocaine offense.  McGee also testified that he had not been offered a deal by the Commonwealth but agreed that six days after he testified in the Commonwealth's case against Ripley, he pled guilty on his second charge of possession of cocaine and received a two-year sentence, with one year and eleven months suspended.

Columbus Sandifer, who had been convicted of approximately ten felonies, testified that he was in the Richmond City Jail with Fogg and that he overheard Fogg saying that "[h]e sent an individual to go and collect some money for him and he come back

-

and he said his boy took care of it."  Sandifer testified that the Commonwealth had not promised him anything for testifying.

A boy, who was eleven years old at the time of the shooting, testified that after 11:00 p.m. on October 20, he saw a sport utility vehicle stop by a man who was walking on Wainwright Drive.  A man exited the driver's side of the vehicle and, after a "couple of seconds" of arguing, shot the man who was walking.  He did not see the face of the shooter but testified that the shooter wore a puffy jacket, which he identified to be similar to a photograph of a jacket Ripley often wore and was wearing on October 20.  He identified the type of vehicle as similar to Bright's vehicle, and he testified that he saw a person run from the vehicle before the shooter entered the vehicle and drove away.

An adult, who resided on Wainwright Drive, testified that she heard an argument at around 11:30 p.m. and went to the front door of her home.  She saw two men "talking loud," saw a man exit a sport utility vehicle, and saw him shoot Adkins.  She then saw a person run from the vehicle before the shooter entered the vehicle and drove away.  She described the shooter's height, weight and race, and she testified that the shooter appeared to be the person depicted in the photograph of Ripley. She testified that after the vehicle drove away, she saw a white car, which she had seen Fogg drive on past occasions, drive by her house.

-

At the conclusion of this evidence, Fogg presented evidence, including his testimony that he "was passed out" on October 20 and that McGee, Rouse, and the Hagy brothers were not at his house on October 20. Although he testified his house was "a crack house," he denied that Ripley collected debts for him. He also testified that Adkins owed him $30 only because he did a favor for Adkins and paid that amount to another man who had Adkins's saw. He denied being involved in the murder and testified that McGee told him of Adkins's murder. Fogg is a convicted felon.

William Moore, a convicted felon, testified that in June 2000 he heard James and William Hagy "say that they were going to get their time to run concurrent for testifying against [Fogg] saying he murdered somebody." Jacob Aquino, another convicted felon, testified that Rouse told him that the Hagy brothers were trying to get him to testify about something he "didn't know anything about." Aquino also testified that the Hagy brothers told him they had a "sweet" deal where they would get "four and a half years" instead of twenty they had received.

At the conclusion of the evidence, the jury convicted Fogg of second degree murder and use of a firearm in the commission of murder. This appeal followed.

## II.

Fogg contends that the trial judge erred in ruling that his attorney could not question the Commonwealth's witnesses

-

regarding pending and dismissed cases until he established that an agreement existed between those witnesses and the Commonwealth's Attorney. The Commonwealth contends the trial judge did not abuse his discretion in limiting cross-examination and contends further that any error made by the trial judge was harmless.

"Cross-examination is an absolute right guaranteed to a defendant by the confrontation clause of the Sixth Amendment and . . . is '[o]ne of the most zealously guarded rights in the administration of justice.'" Clinebell v. Commonwealth, 235 Va. 319, 325, 368 S.E.2d 263, 266 (1988) (citation omitted). It is a right that is "fundamental to the truth-finding process." Id. Thus, the Supreme Court has held that "[a]n accused has a right to cross-examine prosecution witnesses to show bias or motivation and that right, when not abused, is absolute." Brown v. Commonwealth, 246 Va. 460, 464, 437 S.E.2d 563, 564-65 (1993).

> Where the purpose of the inquiry is to impeach a witness' veracity, cross-examination concerning a witness' prior convictions is limited to prior felony convictions and convictions for misdemeanors involving moral turpitude. However, it is error to apply the principles governing cross-examination for purposes of impeaching a witness' veracity to limit cross-examination designed to demonstrate a witness' bias or motive to testify.

Scott v. Commonwealth, 25 Va. App. 36, 41, 486 S.E.2d 120, 122 (1997) (emphasis added). "Although a trial [judge] may exercise

-

discretion to see that the right of cross-examination is not abused, the discretion may be employed only after the right to cross-examine has been fairly and substantially exercised." Barrett v. Commonwealth, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986).

The record clearly establishes that Fogg's attorney's questioning of James and William Hagy about their convictions and the resulting dispositions concerned bias and motive to testify rather than veracity. Furthermore, the proffered testimony in this case established that Fogg's attorney was seeking to show the witnesses' bias. Fogg's attorney proffered evidence that William Hagy had approximately forty-eight charges pending when he first spoke with the Commonwealth concerning the murder. About nineteen of those charges had been nolle prossed, and two had been reduced from felonies to misdemeanors. The proffered evidence also indicated that James Hagy had approximately twenty-seven charges pending when he first spoke to the Commonwealth concerning the murder. Ten of his charges had been nolle prossed, and three had been reduced from felonies to misdemeanors. In addition, both witnesses had several pending criminal cases that had been continued during this time.

In Brown, defense counsel attempted to cross-examine a witness on unadjudicated crimes to prove the witness' bias and motive to testify. The Supreme Court held that the defense "was entitled to cross-examine [the witness] in an effort to

-

establish that his testimony was motivated by a bargain for leniency relating to the charges pending against him, particularly since [the witness] admitted that the trial of those charges had been continued each month since the date of his arrest."  Brown, 246 Va. at 464, 437 S.E.2d at 565.

The Commonwealth argues that the trial judge did not err in this case because there was no evidence of an agreement.  The proffered evidence, however, was a sufficient basis from which the jury could infer that an agreement had been reached and was therefore relevant to the issue of the witnesses' bias and motive to testify.  Indeed, Fogg's attorney introduced a letter written by the prosecuting Commonwealth's Attorney's office to the Commonwealth's Attorneys in ten jurisdictions.  In the letter, the Commonwealth's Attorney explained that both William and James Hagy "continue to cooperate . . . in an on-going murder investigation" and that "they may be called as witnesses for the Commonwealth if and when [an] indictment is obtained."  In pertinent part, the letter also indicated: "While I am aware of the extensive charges they currently have in your jurisdictions, I hope that their cooperation here will be given some consideration in their ultimate dispositions."  The jury certainly could have inferred from this evidence that an agreement existed between the Commonwealth and the witnesses that bore on the issue of bias and motive.

-

Had the jury been privy to the number of charges pending against the Hagy brothers, the jury may have discredited the testimony of both witnesses. Given this potential effect, we cannot say the trial judge's error in limiting defense counsel's cross-examination was harmless.

> "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt;" otherwise the conviction under review must be set aside. This standard requires a determination of "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." In making that determination, the reviewing court is to consider a host of factors, including the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case.

Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (citations omitted).

A critical issue at trial was whether Fogg had directed Ripley to collect a debt from Adkins. On this point, William and James Hagys' testimony bolstered McGee's testimony that he overheard Fogg tell Ripley and Bright to "take care of" a matter and Sandifer's testimony that Fogg sent someone to collect a debt. The fact that this testimony was corroborated by the testimony of both James and William may have persuaded the jury to believe both Sandifer's and McGee's statements.

-

In <u>Lilly</u>, the Supreme Court of Virginia determined that not permitting the defense to cross-examine a witness whose statement was entered against the defendant was not harmless error because, without this corroborating evidence on a critical point at issue, the Commonwealth had only one remaining witness whose credibility was significantly challenged. 258 Va. at 553-54, 523 S.E.2d at 210. Similarly, without the testimony of the Hagy brothers, the Commonwealth's case would have rested substantially on the testimony of McGee and Sandifer, convicted felons, whose testimony was in conflict with Fogg's account of that evening. In addition, only James Hagy testified that Fogg mentioned Adkins's name immediately prior to directing Ripley to "go take care of that." This testimony provided the critical link in the Commonwealth's theory that Fogg's statement concerned Adkins.

When Fogg's attorney sought also to explore the witnesses' bias and personal interest in implicating Fogg, he "was entitled to reveal to the jury the full weight of any pressures brought to bear on [a witness], at the time he testified, which might motivate him to depart from the truth." <u>Hewitt v. Commonwealth</u>, 226 Va. 621, 623, 311 S.E.2d 112, 114 (1984). If the jury had heard the proffered testimony, the jury could have inferred that the Hagys' motivation for testifying was leniency in the overwhelming number of cases currently pending against them.

Thus, the jury may have disbelieved their account of what transpired.

The proffered evidence was neither repetitious nor cumulative. We cannot say beyond a reasonable doubt that the jury would have convicted Fogg without the testimony of James and William Hagy. Accordingly, we conclude that the trial judge's error in restricting cross-examination of the Commonwealth's witnesses was not harmless error.

III.

Fogg additionally contends that, because no evidence of modus operandi was proved at trial, the judge erred in giving the jury an instruction referring to the "unique nature of the method of committing the crime." The Commonwealth contends the objection was waived and the instruction is a correct statement of the law.

The trial judge instructed the jury as follows:

> You may consider evidence that the defendant committed an offense or offenses other than the offense for which he is on trial only as evidence of the following: defendant's motive, malice, intent, scheme or plan, premeditation, the unique nature of the method of committing the crime charged in connection with the offense for which he is on trial conduct and the defendant's feelings towards Daryl Adkins and relations between them and for no other purpose.

At trial, Fogg's attorney objected and said that the instruction concerning evidence of other crimes "can't be introduced about the unique nature or method of committing the

-

crime.  That's modus operandi . . . .  There is nothing unique about this offense."  The trial judge allowed the instruction concluding that "[t]here is a theory of this case that he had an enforcer to collect the drug debts."  Both the objection and ruling addressed the precise issue now raised.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'"  Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (citation omitted).  In the case at bar, the jury was instructed that they could "consider evidence that [Fogg] committed an offense or offenses other than the offense for which he [was] on trial . . . as evidence of . . . the unique nature of the method of committing the crime charged."

The issue of modus operandi may be raised where "there is a disputed issue of identity" and evidence of other crimes is offered in an attempt to establish that the crimes are sufficiently idiosyncratic to permit a logical inference that there was a common perpetrator.  Johnson v. Commonwealth, 259 Va. 654, 677, 529 S.E.2d 769, 782 (2000).  The evidence in this case contained no proof of other crimes that would permit such an inference and, thus, it raises no issue of modus operandi.  The trial judged erred in instructing the jury concerning the "unique nature of the method of committing the crime."  The jury could have improperly applied this instruction, misunderstanding

that the evidence proved a unique offense if it believed Ripley
was an "enforcer" of debts.

IV.

For these reasons, we reverse both convictions and remand
for a new trial consistent with this opinion.

Reversed and remanded.

-