COURT OF APPEALS OF VIRGINIA

Present:    Judges Russell, Malveaux and Athey
Argued by videoconference

DERRICK GERARD TUCKER, JR.

MEMORANDUM OPINION[*] BY
JUDGE WESLEY G. RUSSELL, JR.
MARCH 9, 2021

v.      Record No. 1817-19-2

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
Joseph M. Teefey, Jr., Judge

Nathaniel A. Scaggs (Hill and Rainey Attorneys, on brief), for
appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

A jury convicted Derrick Gerard Tucker, Jr. of first-degree murder, malicious wounding,

shooting into an occupied vehicle, use of a firearm in the commission of murder, and use of a

firearm in the commission of malicious wounding. On appeal, Tucker contends that the trial

court erred in refusing to instruct the jury on the lesser-included offense of voluntary

manslaughter. He argues that statements he made during a police interview provided more than

a scintilla of evidence to support such an instruction. We disagree and affirm the judgment of

the trial court.[1]

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Tucker's police interview was recorded and transcribed. The recording was played for
the jury, and the jury was provided a copy of the transcription, which was admitted into evidence
at trial as Commonwealth's Exhibit 23. As a result, the statements he made in the interview
were part of the evidence at trial.

BACKGROUND

On the evening of May 10, 2018, Everette Tucker[2] and his good friend, Jacqueline Perry, drove to Deborah Fisher's house on South Dunlop Street in the City of Petersburg to purchase "loose" cigarettes from Fisher. Everette parked his car across the street from Fisher's house, leaving Perry in the front passenger seat of the car. After Everette parked his car, a woman came out of her house and told Everette he could not park his car in front of her house. Everette refused to move his car, asserting that he could park on any public street. Everette then walked into Fisher's house where he encountered three men, including Fisher's son and Tucker, but not Fisher. Fisher's son offered to sell Everette the cigarettes he desired, but, according to Everette, the transaction was not completed.

During the discussion about the possible sale of cigarettes, Tucker confronted Everette in a well-lit room about the confrontation he had had with the woman outside. Tucker lifted his shirt to reveal the butt of a gun on his right hip and stated the woman was his "old lady" and that if Everette had "said anything to her," it would make him "want to do something[.]" Everette felt that Tucker was trying "to put some fear in my heart or something." The confrontation did not become physical. Everette left the house, walked straight to his car, and began to drive away.

As he was driving away, Everette heard gunshots that broke the rear window glass of his car. Everette looked back and saw Tucker "standing out there with the gun still in his hand[,]" and he was continuing to shoot. Everette observed that the gun was not orange. Everette was hit in the side by a bullet. Almost immediately, Perry fell into Everette's lap; she was suffering

---

[2] Everette Tucker is not related to appellant Derrick Tucker. To avoid confusion, this opinion will refer to appellant as "Tucker," and Everette Tucker will be referred to by his first name, "Everette."

from a head wound. Everette drove to the hospital where Perry died from the gunshot wound to her head.

Everette testified that he initially believed that the gun concealed under Tucker's shirt was either a .9mm or a .45 caliber firearm. He recalled that, at the preliminary hearing, he was sure the firearm was a .9mm because he knew his weapons, having served in the military. At trial, however, he explained that a .9mm or a .45 caliber firearm look the same from the butt end.

Detective Roosevelt Harris investigated the matter. Harris stated that Everette told him that he went to the Fisher residence often and had been doing so for several weeks. Harris showed Everette a single photograph of Tucker. Everette stated that the person in the photograph was the person he had argued with at the Fisher residence on May 10, 2018. Harris also confirmed that it is not possible to determine the caliber of a bullet a gun will fire based solely on observing the handle of the weapon.

Sergeant Robert William Elkins, the crime scene investigator assigned to this case, responded to Southside Regional Medical Center at approximately 10:16 p.m. He examined and photographed Everette's vehicle, then had it towed for closer inspection. He diagramed one hole in the driver's side rear door and three holes in the rear trunk and bumper area, and he noted that the rear windshield had been shot out of the car. Although he was unable to determine how many shots may have been fired into the rear windshield, he did conclude that the shots were fired from outside the car; he explained that, the broken glass was inside the car and the metal from the bullet holes was also pointing inside the vehicle. He noted a bullet hole in the front passenger headrest. He utilized a "trajectory rod" to determine the path and angle of the bullets and determined that one of the bullets went through the driver's seat.

Later that evening, Elkins also processed the scene at the Fisher residence, which previously had been secured by police. Based on his investigation and with the help of a

witness, Elkins ultimately recovered three .45 caliber cartridge casings. During a subsequent execution of a search warrant at the Fisher residence, Elkins found three firearm magazines: a .45 caliber; a .357 caliber; and an unidentified magazine. Elkins confirmed that the .45 caliber magazine was the same caliber of the rounds found at the scene. Elkins did not find any firearms during the search. He specifically testified that he did not find an orange cap gun or any caps that would fit into a cap gun.

The trial court qualified Megan Korneke as an expert in the fields of firearms and toolmark identification. She testified that she had performed microscopic examinations of the three cartridge casings recovered by police and determined that they had been fired from the same firearm. She also microscopically examined the bullets recovered by police and determined that they also "had been fired from the same firearm[.]" Although she could determine that the casings had come from one firearm and that the bullets had come from one firearm, she could not, without having the firearm itself, conclude that both the casings and the bullets came from the same firearm. She testified that the casings and the bullets were the same caliber and that they all had been made by the same manufacturer.

On May 11, 2018, Tucker spoke with Detectives Ferguson, Christian, and Harris. Tucker admitted he was at Fisher's house the previous evening with Fisher's son and nephew. Everette came looking for cigarettes, and Tucker and Everette exchanged words about Everette being disrespectful to his girlfriend across the street about a parking situation. Tucker stated that Everette bought the cigarettes and then left. Tucker was not "mad" and did not follow Everette outside.

Detective Christian asked Tucker if he had fired some shots into the air just to scare Everette. Tucker responded, "Yeah. That's it." Tucker was unable to recall how many shots he had fired. Christian then asked where the gun was located, and Tucker told him there was no

gun. He stated, "I didn't have no gun. That's what I'm trying to tell you." When Christian questioned him about what he fired into the air, Tucker stated, "Whatever y'all think I shot." Tucker continued to deny that he had a gun, then later in the interview explained that it was an orange cap gun. Finally, Tucker stated that he "[m]ight have been trying to scare him[,]" and later explained that he "wasn't even in the street." Tucker told the detectives he no longer possessed the cap gun.

Douglas DeGaetano analyzed a gunshot residue test that had been performed on Tucker's right and left hands. Gunshot residue and particles that are characteristic of primer residue were found on both of Tucker's hands. DeGaetano explained that primer residue can be found on a person discharging a "real" weapon, but the same result would not occur with the firing of a cap gun. He conceded that there are multiple ways to get gunshot residue on one's hands without firing a weapon, including being in close proximity to a shooter, shaking the hand of a recent shooter, or handling a firearm that has been discharged recently.

The Commonwealth rested its case, and Tucker moved to strike on the basis that the evidence was insufficient to send the case to the jury. The trial court denied the motion and Tucker presented evidence.

Tyree Crenshaw, Tucker's mother, testified that she asked Everette to move his car because it was blocking her driveway and to park in front of the Fisher house given that was where he was going. According to Crenshaw, this prompted angry words from Everette before he entered the Fisher residence. Crenshaw testified that she did not permit her son, Tucker, into the Fisher home due to previous interactions there with the police. At some point not long after Everette entered the home, a group of individuals exited the residence with much arguing and cursing taking place. Crenshaw claimed to have guided Tucker back into her house to remove him from the disturbance. She testified that no gunshots were fired as Everette drove away.

Jaheen Warren, a longtime friend of Tucker, testified he was with Tucker on May 10, 2018 at the Fisher house. He had not met Everette previously, but testified that Everette came into the Fisher house talking loudly and "going off." A "couple" of people went outside to ascertain the problem and witnessed Tucker and Everette arguing. The group tried to calm Tucker "down a little bit[,]" and then Tucker's mother came from across the street and took him home. Warren is familiar with the sound of gunshots and testified that he did not hear any as Everette drove away.

Tucker renewed his motion to strike, and the trial court again denied the motion. During the initial discussions regarding jury instructions, the Commonwealth sought a first-degree murder instruction and neither party requested an instruction on lesser-included homicide offenses. However, as the colloquy on instructions continued, Tucker requested that the jury be instructed regarding lesser-included offenses, to include second-degree murder and voluntary manslaughter. Although Tucker offered no written instruction that the trial court could give or mark as refused, the trial court commented that "for the record," counsel and the trial court's discussions "referenc[ed] the 'waterfall instruction' going from first degree all the way down to manslaughter."[3] The Commonwealth objected to instructing the jury on any theory other than first-degree murder.

Given the request for the instruction, the inquiry became what evidence supported the instruction. There was discussion of the various theories that might have some support in the evidence including Tucker's arguments that no shots were fired, that he never fired a gun, that he

---

[3] At oral argument in this Court, the parties confirmed that the requested instruction, colloquially referred to as the "waterfall instruction[,]" was Virginia Model Jury Instruction 33.700 (Criminal). That instruction provides the elements necessary for the Commonwealth to convict a defendant of first-degree murder, second-degree murder, and voluntary manslaughter and sets out the differences in the elements that lead to a conviction on one of the delineated offenses as opposed to the others. Of note, it does not reference or in any way instruct the jury regarding the crime of involuntary manslaughter.

fired only a cap gun, that he had fired a gun but had only shot into the air to scare Everette, and that he never shot at Everette or Perry. Tucker's argument largely focused on the claim, based on Tucker's police interview, that Tucker only had fired a gun into the air to frighten Everette and not to kill or injure.

In considering the matter, the trial court noted that such actions might be reckless or constitute criminal negligence, suggesting that the conduct described did not support an instruction for an intentional killing. Ultimately, the trial court reviewed portions of Tucker's police interview, stated that Tucker's contradictory statements could not be read in isolation, and concluded that the evidence did not support an instruction on a charge "less than first degree" murder.

After the jury convicted him, Tucker filed a motion to set aside the verdict. In part, Tucker argued that the trial court erred in refusing to give the requested waterfall instruction including the offense of voluntary manslaughter "based on the scintilla of evidence from [Tucker's] interview that he may have just been trying to scare Everette . . . ." The trial court denied the motion.

Tucker now appeals. He contends that, based on the "statement(s) in his police interview[,]" the evidence required the trial court to give the requested waterfall instruction including voluntary manslaughter.

ANALYSIS

I. Standard of review

The decision to grant or refuse a proffered jury instruction "rests within the sound discretion of the trial court." Sarafin v. Commonwealth, 288 Va. 320, 325 (2014). Accordingly, we review a trial court's decision under the deferential abuse of discretion standard. Witherow v. Commonwealth, 65 Va. App. 557, 565 (2015). In conducting such a review, an appellate

court's "sole responsibility . . . is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." Molina v. Commonwealth, 272 Va. 666, 672 (2006) (quoting Swisher v. Swisher, 223 Va. 499, 503 (1982)).

The fact that an instruction "correctly states the law" does not require that it be given. Woolridge v. Commonwealth, 29 Va. App. 339, 348 (1999) (quoting Hatcher v. Commonwealth, 218 Va. 811, 813-14 (1978)). In addition to correctly stating the law, the instruction must be "applicable to the facts and circumstances of the case," id., and have a basis in the evidence, with a party being entitled only to instructions "that are supported by [more than a scintilla of] evidence." Witherow, 65 Va. App. at 565 (alteration in original) (quoting Eaton v. Commonwealth, 240 Va. 236, 255 (1990)).

"The weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis." Mayberry v. Commonwealth, 66 Va. App. 93, 101 (2016) (ellipsis in original) (quoting Woolridge, 29 Va. App. at 348). In making that determination, we view the evidence in the light most favorable to the proponent of the instruction, id., and if, when the evidence is viewed in that light, "a proffered instruction finds any support in credible evidence, its refusal is reversible error[,]" Davis v. Commonwealth, 68 Va. App. 725, 731 (2018) (quoting McClung v. Commonwealth, 215 Va. 654, 657 (1975)).

## II. Voluntary manslaughter[4]

As we recently noted, "[v]oluntary manslaughter is the unlawful killing of another, committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing

---

[4] Although the waterfall instruction Tucker requested at trial referenced both second-degree murder and voluntary manslaughter, Tucker has limited his appellate argument to whether he was entitled to the voluntary manslaughter portion of the instruction. Accordingly, we limit our analysis to that portion of the instruction.

solely out of the quarrel, or combat, or provocation." Dandridge v. Commonwealth, 72 Va. App. 669, 681-82 (2021) (internal quotation marks and citations omitted). Like the various categories of murder, voluntary manslaughter is "an intentional killing[,]" Turner v. Commonwealth, 23 Va. App. 270, 274 (1996), aff'd, 255 Va. 1 (1997); it is distinguished from murder in that voluntary manslaughter occurs in the absence of malice. Barrett v. Commonwealth, 231 Va. 102, 105 (1986). "[I]n other words, a voluntary manslaughter is an intentional killing, but the intent to kill was generated by passion/provocation rather than by an evil disposition." Bacigal and Lain, Virginia Practice: Criminal Offenses and Defenses, Homicide, § III(A) (2020). However, "[w]ords alone, no matter how insulting, are never sufficient to constitute heat of passion[]" that would reduce a murder to voluntary manslaughter. Rhodes v. Commonwealth, 41 Va. App. 195, 201 (2003).

Thus, for Tucker to have been entitled to the instruction he sought related to voluntary manslaughter, the evidence, when viewed in the light most favorable to him, Mayberry, 66 Va. App. at 101, had to support a conclusion that he intentionally killed Perry as a result of passion or provocation resulting from something other than a mere exchange of words.

### III. The evidence did not support a voluntary manslaughter instruction

In the context of whether Tucker was entitled to the jury instruction he sought, viewing the evidence in the light most favorable to him dictates that we credit the evidence that might support the giving of the instruction. Thus, although Tucker advanced multiple theories, including some that wholly exonerated him and some that otherwise contradicted his theory on appeal, our focus is on the evidence Tucker argues entitled him to have the jury instructed regarding voluntary manslaughter. Thus, our focus, consistent with Tucker's arguments in the trial court and on appeal, is on his statements to the police that he fired a gun into the air to frighten Everette.

Accepting this evidence as true did not entitle Tucker to a voluntary manslaughter instruction. As noted above, voluntary manslaughter is an *intentional* killing. The trial court recognized that the claim that Tucker fired a gun into the air suggests recklessness and/or criminal negligence. These are the hallmarks of involuntary manslaughter, which the Supreme Court has defined as

> 1) the *accidental* killing of a person, contrary to the intention of the parties; and 2) the death occurs in the defendant's prosecution of an unlawful but not felonious act, or in the defendant's improper performance of a lawful act. To constitute involuntary manslaughter, the "improper" performance of a lawful act must amount to an unlawful commission of that lawful act, manifesting criminal *negligence*.

West v. Dir. of Dep't of Corr., 273 Va. 56, 63-64 (2007) (emphasis added) (citations omitted).[5] Accordingly, even viewed in the light most favorable to Tucker, this evidence cannot support a conclusion that he committed *voluntary* manslaughter, and thus, the trial court did not err in refusing to give the requested instruction.

Even if the evidence regarding Tucker firing in the air to frighten Everette could somehow be viewed as being consistent with an intentional killing, Tucker still would not have been entitled to a voluntary manslaughter instruction. As noted above, voluntary manslaughter is an intentional killing "committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation[,]" Dandridge, 72 Va. App. at 681-82 (internal quotation marks and citations omitted), and that provocation must have involved more than just an exchange of words, Rhodes, 41 Va. App. at 201. Here, the evidence establishes at most a verbal altercation between Tucker and Everette prior to the shooting. No

---

[5] Because no involuntary manslaughter instruction was requested, the question of whether the evidence may have supported such an instruction is not before us. Accordingly, we offer no opinion regarding that issue.

view of the evidence even suggests a confrontation that could have given rise to the *furor brevis* that is the hallmark of voluntary manslaughter.[6]  Thus, the trial court did not err in refusing to give the requested voluntary manslaughter instruction.

CONCLUSION

For the foregoing reasons, the evidence did not support the giving of the voluntary manslaughter instruction Tucker sought in the trial court, and thus, the trial court did not err in refusing to give the instruction.  Accordingly, the judgment of the trial court is affirmed.

<u>Affirmed.</u>

---

[6] When asked during oral argument in this Court if the initial confrontation involved just words, Tucker's only qualification was to note that the Commonwealth's evidence was that, during the verbal confrontation, *Tucker* had shown Everette that *Tucker* had a gun.  *Tucker* cannot rely on *his* unilateral display of a firearm as the provocation that caused *him* to shoot at others.