COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, Kelsey and Senior Judge Overton
Argued at Richmond, Virginia


RICHARD RULEMAN HUGHES, JR.,
 SHANNON WAYNE HUGHES AND
 SHAWN WILLIAM HUGHES
                                                             OPINION BY
v.      Record No. 0372-03-3                     JUDGE ROBERT P. FRANK
                                                             JULY 6, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
John J. McGrath, Jr., Judge

        David B. Hargett (W. Todd Watson; Hargett & Watson, on brief),
        for appellant.

        Deana A. Malek, Assistant Attorney General (Jerry W Kilgore,
        Attorney General, on brief), for appellee.


        Richard Ruleman Hughes, Jr., Shawn William Hughes, and Shannon Wayne Hughes

(collectively "appellants") were each convicted in a jury trial of three counts of malicious

wounding by a mob, in violation of Code § 18.2-41, and one count of assault and battery by a

mob, in violation of Code § 18.2-42.  On appeal, appellants contend (1) the evidence was

insufficient to prove they constituted a mob; (2) the trial court erred in not giving a self-defense

instruction.[1]  For the reasons stated, we affirm the convictions.

BACKGROUND

        On June 30, 2002, Arthur Leonard hosted a party at his home to celebrate a friend's

birthday.  Appellants, who are brothers, and several of their friends heard about the party and

        [1] Appellants proffered two self-defense instructions, one with fault and one without fault.
On appeal, they treat these instructions as one.

decided to go "party crashing." While talking prior to leaving for the party, one of the friends, Christopher Gittens, noticed Shannon had a 2-1/2 inch knife "folded" in his hand. When Gittens asked why he had the knife, Shannon replied, "[Y]ou never know when you might need it . . . ." Appellants drove to the party in a red Honda Civic.

At approximately 1:30 a.m., Leonard attempted to bring the party to an end. Leonard kept repeating himself because "nobody really paid attention and some of them got a little argumentative." A group of people, including appellants, came to the front door. Leonard and Ryan Kernutt told them that the party was over.

Richard "got in" Leonard's face and said, "[Y]ou don't know me . . . . I'm a killer, I'm a killer, you don't do this to me." Richard then pulled out a black switchblade knife. Shawn was standing with Richard and looked angry. Richard was told that no one wanted a fight; they were just trying to end the party. Richard and Shawn turned and walked away. Leonard and Kernutt went back inside the house. Jeffrey Zirkle, another person at the party, heard Richard tell his brother Shawn, "do the dance" and Shawn began jumping around, "acting silly." A few minutes later, a fight erupted outside. There were approximately fifteen to twenty people there at the time.

Daniel McLaughlin, an occupant of the house, saw "a couple of guys" come up to the door and attempt to enter. He testified, "The same guys that had been sitting across the parking lot for probably an hour" in a red Civic. When McLaughlin asked them to leave, Shawn said to "go F" himself. McLaughlin replied, "[W]e don't need that in here, we don't [sic] any knives." Shawn said "okay" and walked out. McLaughlin went inside the house and then noticed that outside a fight "broke out." While McLaughlin saw all three brothers during this confrontation, he could not positively identify them as being involved in the fight.

As Amber Phillips was leaving the party, she observed Richard arguing with one of her girlfriends outside. She asked Richard to leave, indicating that they "weren't looking for any kind of confrontation and it would just be better if they just left." Richard told her he had "never been kicked out of anywhere" and she should not "show [her] face anywhere" in town because he would have her "personally escorted out." Richard then walked away.

Michael McLaughlin heard someone asking people to leave the party. He heard people responding they would not leave. McLaughlin walked out the back door and announced, "yes you are leaving." Shawn then swung at McLaughlin, but missed him. As McLaughlin leaned back, Richard hit him in the face. Prior to the assault, McLaughlin had not lunged at anyone nor spit in anyone's face. Phillips observed McLaughlin being hit in the head by two men that she could not identify. Phillips grabbed McLaughlin and "pulled him in towards the house."

Reid Adams heard the commotion, saw Michael McLaughlin being attacked, and went outside the house. As he stepped out the back door, he was attacked by Shawn. Shawn "thrust toward [his] stomach." Adams thought Shawn had punched him. As Adams and Shawn "wrestled around," Shannon joined the attack, smashing a bottle on the side of Adam's head. Shawn then left the fight. Shannon and Adams continued to struggle on the ground until Shannon left. Adams began having trouble breathing and realized that he had been stabbed four times in his chest and stomach.

Dustin Furlough testified that several uninvited people were at the party. When they were asked to leave, "problems started." Richard, who was standing in the parking lot, yelled, "we're killers." Furlough then saw Shawn and Shannon attacking Michael McLaughlin. Furlough went to break up the fight, but he was attacked by Richard, who threw Furlough to the ground. Richard then jumped on Furlough's back. Shawn joined Richard, and the two brothers

- 3 -

started hitting Furlough in the back. Richard wrapped his hand around Furlough's head and tried to gouge Furlough's eyes out.

Dominic Binetti observed Shawn approach Furlough from the rear and stab him in the back. Binetti saw the knife in Shawn's hand. He then tried to jump Shawn. Shawn pulled the knife, swung it, and "nicked" Binetti's forearm.

Kernutt also went to Furlough's aid, grabbing Richard in a bear hug and saying, "calm down, calm down." Richard told Kernutt he had a knife and threatened to kill him if Kernutt did not let him go. Kernutt let go of Richard's arms and tried to get away from him. Richard then raised his hands over his head, clenching both of his fists, with the blade of a knife sticking out from his hands.

Megan Pritchard also came to Furlough's assistance. She grabbed Richard's shirt. He flipped her over, and she saw a knife in his hand.

James Griffenhagen went outside while other people were asking appellants to leave. While he was outside, he saw Richard and either Shawn or Shannon punch another person from the party. Griffenhagen tried to push them away and told them "to relax." Richard came up behind Griffenhagen and placed a knife against his neck. He told Griffenhagen to let go of his "friend" or he would slice his throat. Richard pressed the knife against Griffenhagen's neck and cut him.

Appellants eventually "convened together" and left in their car. Jeffrey Zirkle and Casey Mork left with appellants and went to Mork's garage where they discussed the fight. While in the garage, Richard ground down the blade of a knife on a bench grinder, explaining he was grinding it to "get rid of the evidence." When the police arrived at the house to speak with them, they turned off the lights in the garage because they "didn't want the cops to come over and bother [them]."

Mork testified about the events at the party that night. He claimed appellants were "making their way to the parking lot" when an unidentified person "got in their face." That person spit on one of the brothers. A fight then ensued. Mork did not see any of the brothers with a knife during the fight nor did he see anyone get stabbed.

Detective Jim Fetterman interviewed Richard. Richard told the detective that appellants were asked to leave the party and did. As they walked to the parking lot, they were "jumped," beaten, and one of their attackers spit on Shannon. Richard denied having a knife.

Shawn told Detective Fetterman that, as they were leaving the party, they were "bum rushed" in the parking lot. Shawn indicated he was choked by one of the assailants. Shawn admitted that he, Richard, and Shannon were all involved in the fight, but denied stabbing anyone. Shawn exhibited two injuries to the detective, "a darkened eye area and also something across his chest."

Shannon told Investigator Rick Warford that, as appellants were leaving the party, an "unknown male" "just walked over and spit" on him. Richard then responded, "Man, he spit on you. Let's go." As they walked to their car, they were "jumped" by unknown individuals. At that point, Shannon said he lost sight of Richard and Shawn. He claimed he was "kicked and punched all over his body." Shannon said he broke free and then saw "an unknown man who appeared who was holding a knife and said someone just got cut." Shannon saw this man after he and his brothers "were back together and got back in the car." Appellants then left. The investigator testified he saw only two very small, faint marks on Shannon.

## ANALYSIS

### A. Evidence of a Mob

Appellants argue the evidence is not sufficient to prove they were members of a mob. Under Code § 18.2-38, a "mob" is defined as "[a]ny collection of people, assembled for the

purpose and with the intention of committing an assault or a battery upon any person or an act of violence as defined in § 19.2-297.1, without authority of law . . . ." We find the evidence was sufficient to prove appellants acted as members of such a mob.

When reviewing the sufficiency of the evidence to support a conviction:

> "it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). Moreover, "[i]f there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion." Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998).

> Furthermore, "[t]he credibility of a witness and the inferences to be drawn from proven facts are matters solely for the fact finder's determination. In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citations omitted).

Snow v. Commonwealth, 33 Va. App. 766, 774, 537 S.E.2d 6, 10 (2000).

To prove the crime of battery or maiming by mob, the Commonwealth must "establish beyond a reasonable doubt that the group of persons were at the time of the battery [or maiming] assembled as a mob with a purpose and intention of committing an assault or battery [or maiming]." Harrell v. Commonwealth, 11 Va. App. 1, 4, 396 S.E.2d 680, 681 (1990). "The statutory definition of a mob requires that the act of assembling be done for a specific purpose and with a specific intent -- to commit an assault or a battery without lawful authority." Id. at 6, 396 S.E.2d at 682. Harrell sets forth the basis for this analysis.

> [W]e are concerned not just with the subjective intention of the individual, [a defendant], but with whether the group assembled and collectively formed with a purpose and intention to assault and batter any person. Code § 18.2-38.

Not every incidence of group violence or assaultive conduct which involves a number of people collectively involved in assaultive conduct constitutes a "mob" assault and battery. In order for group behavior by individuals to become mob behavior, thereby making "[a]ny and every person composing a mob" culpable for the criminal acts of the other mob members, the group must have "assembled for the purpose and with the intention of committing an assault or a battery upon any person." Code § 18.2-38. The criteria which distinguishes individual behavior while part of a group from "mob" behavior is assembling for the specific purpose and with the specific intent of committing an assault and battery upon any person. That is not to say that the purpose for which the group initially came together must have been for the purpose of committing an assault and battery before a "mob" may be said to have "assembled." It is possible that individuals who are lawfully assembled may become members of a "mob" without great deliberation and for them to become part of a group which is moved or controlled by those impulsive and irrational forces which perpetuate mob violence. For a group of persons lawfully gathered for whatever purpose to "assemble" as a mob within the intendment of Code § 18.2-38, they need only to collectively band together with the common purpose and intention of committing an assault and battery upon a person. Whether a group of individuals has been so transformed into a "mob" depends upon the circumstances; no particular words or express agreements are required to effect a change in a group's purpose or intentions. Events or emotionally charged circumstances suddenly may focus individuals toward a common goal or purpose without an express or stated call to join forces.

Id. at 7-8, 396 S.E.2d at 682-83.

Within this framework, we examine the facts of the instant case. We must determine if the evidence permitted the fact finder to conclude appellants acted individually or as a "mob." More specifically, we must determine whether the appellants collectively banded together with the specific intent and purpose to commit an assault.

The three brothers initially assembled and decided to "crash" a party. Until appellants and their entourage arrived, the party was peaceful. At least one of the brothers carried a weapon with him. When appellants were asked politely to leave, Richard responded, "I'm a killer, I'm a killer, you don't do this to me." He pulled out a switchblade knife. Shawn, standing next to

- 7 -

Richard, "looked angry." Shawn told McLaughlin to "go F himself" when he was told to leave. Several fights then ensued.

Shawn swung at Michael McLaughlin, who had told the brothers to leave, but missed. Richard then hit McLaughlin in the face. The brothers acted in concert to attack McLaughlin. Shawn then attacked Adams, thrusting toward Adams's stomach. As Adams and Shawn struggled, Shannon smashed a bottle over Adams's head. Again, appellants were acting in concert.

During the melee, Richard attacked Furlough, throwing him to the ground. Shawn and Shannon joined the attack on Furlough. Richard tried to "gouge" out Furlough's eyes. Shawn stabbed Furlough in the back. As Binetti tried to assist Furlough, Shawn swung a knife at him, nicking his arm. Kernutt also went to Furlough's aid. Richard threatened to kill Kernutt if he would not release him. Again, appellants were acting in concert to assault someone.

Griffenhagen saw Richard and one of his brothers attacking a guest. Griffenhagen then grabbed one of the assailants. In response, Richard placed a knife against Griffenhagen's neck and cut him.

As we said in Harrell, the group could initially be assembled lawfully, but may become a mob "without great deliberation." 11 Va. App. at 7, 396 S.E.2d at 683. The evidence here supports a finding that the appellants "collectively band[ed] together with the common purpose and intention of committing an assault and battery." Id. Their actions in attacking various individuals clearly indicate that they were acting collectively with the intent to assault.

Appellants arrived at the party together, uninvited and armed. When asked to leave, they became angry and aggressive. Systematically, they attacked a number of the party's hosts and guests. Each brother assisted the other brothers in the attacks. Each brother fought off people who were trying to assist the victims. Appellants, agitated when asked to leave the party,

- 8 -

collectively attacked a number of victims and did not act as independent aggressors. The jury

properly found, based on this evidence that appellants acted as a mob.

### B. Self-Defense Instruction

Appellants next contend the trial court erred in not granting their offered instructions on

self-defense. They argue the trial record supports a self-defense instruction based on testimony

that, as appellants were leaving the party, an unidentified person "got in their face" and spit on

one of the brothers. They claim a group of people began attacking them. Shawn was choked by

one of these assailants. They also claim they were unarmed.

> Because the trial court refused to grant the instruction proffered by the accused, we view the facts in the light most favorable to the defendant. Commonwealth v. Alexander, 260 Va. 238, 240, 531 S.E.2d 567, 568 (2000). However, an instruction is proper only if supported by more than a scintilla of evidence. Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998). If the instruction is not applicable to the facts and circumstances of the case, it should not be given. Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978) (citing Banner v. Commonwealth, 204 Va. 640, 647, 133 S.E.2d 305, 310 (1963)).

Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001). In evaluating whether

the trial court erred in failing to grant an instruction, the appellate courts review the record for

"affirmative evidence" that supports the instruction, rather than basing the review upon "the

jury's ability to reject evidence that is uncontroverted." Commonwealth v. Vaughn, 263 Va. 31,

37, 557 S.E.2d 220, 223 (2002). See Donkor, 256 Va. at 446-47, 507 S.E.2d at 77 (finding the

Court of Appeals erred "in treating the jury's ability to reject evidence as a substitute for the

evidentiary support required to grant a defendant's request for an instruction" and reinstating the

conviction).

"Self-defense excuses or justifies a homicide or assault committed while repelling

violence arrayed against the defendant. It is a response to the threat of death or serious bodily

harm. It is a defense to an act of violence that repels violence directed at the defendant."

Graham v. Commonwealth, 31 Va. App. 662, 672, 525 S.E.2d 567, 572 (2000).

> "[S]elf-defense may be either justifiable or excusable. If it is either, it entitles the [accused] to an acquittal." In either case, he is deemed to be innocent and guiltless of any crime. Bailey v. Commonwealth, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958) (citations omitted). Assessing whether a particular act was committed in self-defense is distinct from determining whether its commission was intentional. In making a plea of self-defense, an accused *"implicitly admits the killing [or wounding] was intentional."* McGhee [v. Commonwealth], 219 Va. [560,] 562, 248 S.E.2d [808,] 810 [(1978)] (emphasis added). Instead, the issue in a plea of self-defense is whether the accused's admittedly intentional act was either justifiable or excusable. See id.; cf. Barrett v. Commonwealth, 231 Va. 102, 106, 341 S.E.2d 190, 192 (1986) (stating that "[a] plea of self-defense and a claim of provoked heat of passion do not conflict with each other").

Peeples v. Commonwealth, 30 Va. App. 626, 642-43, 519 S.E.2d 382, 390 (1999) (*en banc*) (Lemons, J., concurring).

Our inquiry begins by considering whether more than a scintilla of evidence supports the contention that appellants stabbed the victims while under reasonable apprehension of death or great bodily harm. If not, then the self-defense instruction was properly denied. Simply claiming they acted in self-defense is insufficient. Some affirmative evidence must suggest appellants were under reasonable apprehension of death or great bodily harm.

No evidence suggests appellants stabbed the victims in self-defense. Examining the evidence in the light most favorable to appellants, the record establishes that someone spit on Shannon and that a group of people attacked appellants as they were leaving the party. To infer these attackers were the victims is pure speculation. No one identified any of the victims as a member of the group that allegedly attacked appellants. To support a self-defense instruction, appellants must point to affirmative evidence that these victims were physically threatening them. See Vaughn, 263 Va. at 37, 557 S.E.2d at 223 (a defendant must have affirmative

evidence to support a self-defense instruction); Graham, 31 Va. App. at 672, 525 S.E.2d at 572 (a self-defense instruction is justified when the defendant repels a threat of death or great bodily harm).

Appellants claim that evidence in the record supports their theory that the victims were injured during the attack on appellants. However, that testimony was given by someone who did not see anyone stabbed or cut. The witness merely speculated that "if it would have happen [sic], probably [it occurred] while everyone was fighting." The witness was not clear about who was probably injured during the fighting -- the victims or appellants. The question to which he responded did not specify whether the injuries were to the victims or to appellants, and the witness did not see for himself who was injured or how anyone was injured. This evidence is not more than the scintilla necessary to support a jury instruction on self-defense.

While some evidence supports appellants' claim that they were attacked in the parking lot, no evidence supports a claim that they acted in self-defense. Although the jury could have believed appellants' statements that they did not have any weapons, and thereby could have found appellants not guilty, that evidence does not alternatively support the contention that appellants acted in self-defense. See Vaughn, 263 Va. at 37, 557 S.E.2d at 223.

### CONCLUSION

We find the evidence is sufficient to support the jury's finding of guilt. We also find the trial court did not err when it rejected appellants' self-defense instructions.

Affirmed.