COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Beales
Argued at Richmond, Virginia


JERRY LAMONT BARNES

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2589-05-2                 JUDGE JEAN HARRISON CLEMENTS
                                                          JANUARY 9, 2007
COMMONWEALTH OF VIRGINIA


                 FROM THE CIRCUIT COURT OF THE CITY OF HOPEWELL
                               W. Allan Sharrett, Judge

               (Christopher B. Ackerman, on brief), for appellant.  Appellant
               submitting on brief.

               Karen Misbach, Assistant Attorney General (Robert F. McDonnell,
               Attorney General, on brief), for appellee.


        Jerry Lamont Barnes was convicted in a jury trial of malicious wounding, in violation of

Code § 18.2-51.  On appeal, he contends the trial court erred in (1) finding the prosecutor's use of a

peremptory strike to remove a member of the jury panel was not racially motivated, (2) refusing to

instruct the jury that malice may not ordinarily be inferred from a blow with a fist, and (3) refusing

to instruct the jury on heat of passion.  Finding no error, we affirm the trial court's judgment and

appellant's conviction.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

_____
        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

Barnes was indicted for feloniously and maliciously causing bodily harm to Andra Childers, a household member, with the intent to maim, disfigure, disable, or kill her.

During jury selection, the prosecutor exercised a peremptory strike to remove Donna Pettaway, an African-American woman, from the jury panel. Barnes's attorney objected, arguing that the removal of Pettaway was racially motivated. The prosecutor explained her use of a peremptory strike to remove Pettaway from the jury panel as follows: "Pettaway is a familiar name in the Commonwealth's Attorney's office. I'm not sure if she is related to them or not. Hopewell is a small town. I . . . had two Pettaways on my docket yesterday. I was concerned about her family's dealings with my office." Defense counsel responded, "They are not good reasons to be removing [her]."

In the ensuing discussion with the trial judge, the prosecutor acknowledged that Pettaway did not indicate during voir dire questioning of the jury panel that any member of her family had been charged with a crime. When asked by the judge why she did not follow up on Pettaway's lack of a response by privately asking her if anyone in her family had been arrested, the prosecutor explained that there were "many different Pettaways and [she] did not call specific names to follow-up on that." She further explained that she had already decided at that point to use a peremptory strike to remove Pettaway from the jury panel, rather than attempt to do so for cause.

After initially finding the defense had "made out a prima facie case of purposeful discrimination," the trial judge concluded that the prosecutor's explanation for striking Pettaway was neither inherently discriminatory nor a pretext for racial discrimination. Accordingly, the judge overruled the defense's objection to the peremptory strike.

At trial, two very different versions of the events of the night in question emerged. Childers testified that she and Barnes were living together in an apartment at the time of the

alleged assault. According to Childers, she was drinking alcoholic beverages and playing cards with friends at a neighbor's apartment in the same building on March 25, 2005. When Barnes came home that night, he went to the apartment where Childers was playing cards and angrily dragged her down the hallway to their apartment. There, he hit her once with his open hand and stepped on her face when she fell to the floor. She said she remained in her apartment in bed until the next day when her neighbors discovered her and called the police.

Robert Gregory testified that he hosted the card game attended by Childers on March 25, 2005. He said that, when Barnes arrived at the card game, he grabbed Childers's shirt and pulled her down the hall to their apartment. Shortly thereafter, he heard noises from their apartment that "sounded like a woman getting hurt." He further testified that, when he saw Childers the next day, her face was "black and blue" and "swollen" and that it was not like that the night before.

Richard Barbie, a neighbor of Childers and Barnes, testified that Barnes approached him in the hallway of the apartment building on March 26, 2005, and said he "need[ed] somebody to talk to, bad." After speaking with Barnes, Barbie went to Childers and Barnes's apartment, and knocked on the door. When Childers answered the door, Barbie saw she had a "[m]essed up face." Barbie called 911.

The police officer who investigated the call testified that Childers told him she had been "beaten" by Barnes but did not report that Barnes had kicked or stepped on her. He noted in his report that Childers stated that Barnes "had punched her in the face several times with his fist." The officer also testified that, when he went to Childers and Barnes's apartment, he saw "blood splatter" on the bed where she was sitting. He also observed that "the left side of her face was very swollen," her eye was "bruised" and "half swollen shut," and she had "blood trickling from her nose and from her mouth area."

The doctor who treated Childers in the emergency room on March 26, 2005, testified that Childers told him she had been punched in the face the previous day. He ordered a CAT scan to evaluate her facial injuries. The scan revealed that her cheekbone, jawbone, and "two bones deeper inside the face" were fractured. The doctor testified that the fractures were recently inflicted and the result of "very significant trauma to her face" caused by blunt force. The doctor further testified that Childers "was so swollen and bruised," he could not tell whether the injuries had been caused by one punch or multiple punches.

Barnes testified at trial that he and Childers had a romantic relationship and had lived together for six months. According to Barnes, he returned home from work on the night of March 25, 2005, and found Childers asleep in bed with another man who lived in their building. Childers and the man were nude and highly intoxicated. Barnes, who had previously spoken to a police officer about this man visiting his apartment, became "frustrated" by what he saw. He woke the man and asked him to leave. A scuffle ensued. Barnes and the man "got locked up or tangled up, fists were flying, open hands were flying." Childers "woke up . . . while [Barnes] and [the other man were] tussling, [and] some kind of way she got hit" when she sat up in the bed during the commotion. After the struggle, the man grabbed his clothes and ran from the room. Barnes talked with Childers, trying to get an explanation, and then left the apartment. Barnes testified the room was "dim and lit from the light on the TV" during these events. He further testified that he did not "see [Childers] get hit." He denied stomping on her face. He also testified that the events related to the card game had happened a week before the events of March 25, 2005.

During a discussion regarding jury instructions, Barnes's attorney asked the judge to instruct the jury that, "[u]nder ordinary circumstances[,] malice may not be inferred from a blow with a fist." The trial judge refused to give the instruction, ruling that the statement "seems to

contradict the law" and that there was "evidence of a foot stomping should the jury choose to believe it." Barnes's attorney also asked the judge to instruct the jury on heat of passion. The judge ruled that no evidence was presented by either party that supported the giving of such an instruction. The trial judge gave a finding instruction that set out the requisite elements of malicious wounding, unlawful wounding, and assault and battery.

The jury subsequently convicted Barnes of maliciously causing bodily injury, as charged. This appeal followed.

## II. PEREMPTORY STRIKE

On appeal, Barnes contends the Commonwealth's use of a peremptory strike to remove Pettaway was racially discriminatory in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Specifically, he contends the trial judge erred in ruling the prosecutor's stated reason for striking Pettaway was race neutral. We disagree.

The United States Supreme Court held in Batson, that, "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at 89 (quoting United States v. Robinson, 421 F. Supp. 467, 473 (Conn. 1976)).

> When a defendant raises a challenge based on Batson, he must make a prima facie showing that the peremptory strike was made on racial grounds. At that point, the burden shifts to the prosecution to produce race-neutral explanations for striking the juror. The defendant may then provide reasons why the prosecution's explanations were pretextual and the strikes were discriminatory regardless of the prosecution's stated explanations. Whether the defendant has carried his burden of proving purposeful discrimination in the selection of the jury is then a matter to be decided by the trial court.

Jackson v. Commonwealth, 266 Va. 423, 436, 587 S.E.2d 532, 542 (2003).

In assessing whether the prosecutor's explanation for striking the potential juror is race neutral as a matter of law, "'the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam) (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality opinion)). Indeed, "[a]lthough the prosecutor must present a comprehensible reason" for the strike, the justification proffered by the prosecutor need not be "'persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." Rice v. Collins, 126 S. Ct. 969, 973-74 (2006) (quoting Purkett, 514 U.S. at 767-68).

If the prosecutor provides a race neutral reason for the peremptory strike, "the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." Id. at 974. "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor . . . ." Id. (quoting Purkett, 514 U.S. at 768). It is at this stage of the inquiry that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Id. Hence, "[t]he burden of 'proving that the prosecution engaged in purposeful discrimination' remains with the defendant and may not be shifted to the trial court" in "'the absence of defense counsel's identification of a false or pretextual reason for the peremptory strike[].'" Robertson v. Commonwealth, 18 Va. App. 635, 638, 445 S.E.2d 713, 715 (1994) (quoting Buck v. Commonwealth, 247 Va. 449, 453, 443 S.E.2d 414, 416 (1994)). The trial court's finding that the prosecutor's explanation for the strike is not pretextual or false is entitled to great deference and that determination will not be reversed on appeal unless it is clearly erroneous. Id. at 639, 445 S.E.2d at 715. "This standard of review logically recognizes the trial

court's unique opportunity to observe and evaluate 'the prosecutor's state of mind based on demeanor and credibility' in the context of the case then before the court.'" Id. (quoting Hernandez, 500 U.S. at 365).

Here, the prosecutor's reasoning for the peremptory strike related to Pettaway's last name. The prosecutor explained that, in light of Hopewell's small size and the Commonwealth's Attorney's office's familiarity with the name Pettaway, she was concerned that Pettaway might be related to the "many" Pettaways who had had dealings with the Hopewell Commonwealth's Attorney's office. Implicit in this explanation is the prosecutor's concern that Pettaway might have harbored a bias against the prosecution because of her family ties. That concern, according to the prosecutor's explanation, was based strictly on Pettaway's last name. Plainly, having the same last name as others who have been prosecuted by the Commonwealth's Attorney's office is not peculiar to any race. Likewise, concern about a potential juror's bias against the Commonwealth, based on family ties to criminal defendants, transcends the race or ethnic background of the juror. Thus, taken as true, the prosecutor's explanation indicates the peremptory strike was not based on the intention to exclude an African-American from the jury panel, but rather on the intention to exclude a potential juror whose impartiality may have been tainted by their family connections. Such reasoning would apply to exclude all similarly situated jurors regardless of their race. Additionally, the prosecutor's explanation was not manifestly based on impermissible generalizations or stereotypical assumptions regarding racial groups. We conclude, therefore, that the prosecutor's explanation was not inherently discriminatory. Hence, the trial judge correctly deemed it race neutral.

Moreover, Barnes failed to meet his burden of proving purposeful discrimination. After the prosecutor presented her explanation for striking Pettaway from the jury panel, Barnes's counsel made no attempt to show that the prosecutor's explanation was merely a pretext for a

racially motivated strike. Instead, he argued solely that "[t]hey [were] not good reasons" for removing Pettaway. Having been provided no basis to conclude otherwise, the trial judge found that the prosecutor's explanation for striking Pettaway was not pretextual. Upon our review of the record, we cannot say that finding was clearly erroneous.[1]

Accordingly, we hold the trial judge did not err in overruling the defense's <u>Batson</u> objection to the prosecutor's use of a peremptory strike to remove Pettaway from the jury panel.

## II. JURY INSTRUCTIONS

On appeal, Barnes argues that, because the evidence permitted the jury to conclude that he struck Childers only once in the face with his hand, the jury should have been instructed that, "[u]nder ordinary circumstances[,] malice may not be inferred from a blow with a fist."[2] He also argues that, because the evidence permitted the jury to conclude that he wounded Childers as a result of the sudden rage he experienced in finding his live-in girlfriend naked in bed with another man, the jury should have been instructed on the defense of heat of passion. In refusing to give those instructions, the jury was not afforded the opportunity to find he lacked the requisite intent to convict him of malicious wounding, he maintains. Thus, he concludes, the trial court erred in refusing to give the two jury instructions he requested concerning malice. We disagree.

---

[1] On appeal, Barnes argues that the prosecutor's basis for removing Pettaway was "based on conjecture and speculation" because no evidence obtained during voir dire suggested Pettaway was related to anyone who had had dealings with the Commonwealth's Attorney's office. However, Barnes's "failure to raise these arguments before the trial court precludes him from raising them for the first time on appeal." <u>Buck</u>, 247 Va. at 452-53, 443 S.E.2d at 416; Rule 5A:18.

[2] The Commonwealth does not contest Barnes's claim that the evidence supports a finding that he hit Childers in the face with his hand only once. Thus, for purposes of resolving the present issue, we will assume, without deciding, that Barnes's claim is correct.

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." Commonwealth v. Vaughn, 263 Va. 31, 33, 557 S.E.2d 220, 221 (2002). "'The trial judge has broad discretion in giving or denying instructions requested.'" Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (en banc) (quoting John L. Costello, Virginia Criminal Law and Procedure § 60.6-8, at 810 (2d ed. 1995)).

In reviewing a jury instruction, we have the responsibility "'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)). "No instruction should be given that 'incorrectly states the applicable law or which would be confusing or misleading to the jury.'" Mouberry v. Commonwealth, 39 Va. App. 576, 582, 575 S.E.2d 567, 569 (2003) (quoting Bruce v. Commonwealth, 9 Va. App. 298, 300, 387 S.E.2d 279, 280 (1990)). "A party is entitled to have the jury instructed according to the law favorable to his or her theory of the case if evidence in the record supports it." Foster v. Commonwealth, 13 Va. App. 380, 383, 412 S.E.2d 198, 200 (1991). However, "it is not error to refuse an instruction when there is no evidence to support it." Commonwealth v. Sands, 262 Va. 724, 729, 553 S.E.2d 733, 736 (2001). In other words, even if the requested jury instruction contains an accurate statement of the law, "a trial court does not abuse its discretion by refusing the instruction if it 'is not applicable to the facts and circumstances of the case,' Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978), or if it 'would have created confusion and would have been misleading[,]' Hubbard v. Commonwealth, 243 Va. 1, 15, 413 S.E.2d 875, 883 (1992)." Juniper v. Commonwealth, 271 Va. 362, 431, 626 S.E.2d 383, 426 (2006).

A. Inference of Malice from a Blow with a Fist

> Malice inheres in the intentional doing of a wrongful act
> without legal justification or excuse. Malice is not confined to ill
> will, but includes any action flowing from a wicked or corrupt
> motive, done with an evil mind or wrongful intention, where the
> act has been attended with such circumstances as to carry in it the
> plain indication of a heart deliberately bent on mischief. Malice is
> implied from any willful, deliberate and cruel act against another.

Williams v. Commonwealth, 13 Va. App. 393, 398, 412 S.E.2d 202, 205 (1991). Addressing the

question whether malice may be inferred from a blow with a fist, the Supreme Court stated in

Roark v. Commonwealth, 182 Va. 244, 28 S.E.2d 693 (1944), as follows:

> Ordinarily, the fist is not regarded as a dangerous or deadly
> weapon. Hence, usually, death is not held to be a natural and
> probable result of a blow with the bare fist. Under ordinary
> circumstances no malice may be inferred from such a blow even
> though death results. However, an assault with the bare fist may
> be attended with such circumstances of violence and brutality that
> an intent to kill will be presumed.

182 Va. at 250, 28 S.E.2d at 695-96 (citations omitted).

In Roark, the victim and the appellant got into an argument. Id. at 246, 28 S.E.2d at 694.

The appellant, who was right-handed, struck the victim with his left fist and knocked him to the

ground. Id. at 246, 252, 28 S.E.2d at 694, 696. The victim suffered a cracked skull when his

head hit the sidewalk. Id. at 246, 28 S.E.2d at 694. The victim was taken to the hospital where

he died later that day. Id. All of the doctors who examined the victim agreed "that death

resulted from the fractures and that the fractures were the result of the fall on the sidewalk and

not the blow" by the defendant. Id. at 247, 28 S.E.2d at 694. The Supreme Court held that the

circumstances of that case would not support an inference of malice, as a matter of law. Id. at

247, 28 S.E.2d at 694.

Relying on Roark, Barnes contends the trial judge should have instructed the jury that,

"[u]nder ordinary circumstance[,] malice may not be inferred from a blow with a fist." However,

- 10 -

the facts in this case are unlike the situation in <u>Roark</u> where the victim's injuries were the result of the fall rather than the blow with the fist itself. The facts here are more analogous to those in <u>Fletcher v. Commonwealth</u>, 209 Va. 636, 166 S.E.2d 269 (1969).

In <u>Fletcher</u>, the appellant hit the victim in the face with his fist while the victim was sleeping. 209 Va. at 638, 166 S.E.2d at 271.

> As a result of the assault on [the victim], blood ran out of his eyes, nose and mouth. He sustained cuts on his forehead, over the side of his mouth, and on his cheek. There were bruises below the lower lid of his right eye and a moderate superficial hemorrhage in the eye, and a definite depression of the left eye. He had double vision in "all fields of gaze." He also suffered what his doctor described as a "blow-out fracture of the orbital floor with incarceration of muscle and the orbital tissue in the fracture." The doctor testified that a blow or blows with a fist could have caused the injuries suffered by [the victim].

<u>Id.</u> at 638, 166 S.E.2d at 271-72. Addressing the appellant's claim that the trial court erred in refusing to instruct the jury that "an intent to permanently maim, disable, disfigure or kill cannot be presumed by a blow from a fist," the Supreme Court held:

> Under ordinary circumstances, an intent to maim may not be presumed from a blow with a bare fist. But an assault with a bare fist may be attended with such circumstances of violence and brutality that an intent to kill may be presumed.
> Here the evidence shows that the assault with the bare fist was attended with such circumstances of violence and brutality that an intent to maim, disfigure or kill may be presumed. The evidence did not justify giving the instruction in the form offered, and it would have been misleading to the jury. Thus it was properly refused.

<u>Id.</u> at 640-41, 166 S.E.2d at 273 (citations omitted).

As in <u>Fletcher</u>, the evidence presented in this case, even when viewed in the light most favorable to Barnes, supports the finding that the circumstances of violence and brutality that attended the assault were extraordinary. Indeed, the uncontradicted medical evidence presented in this case established that Childers's cheekbone, jawbone, and "two bones deeper inside the

- 11 -

face" were fractured as a result of the assault by Barnes. The doctor who examined Childers testified that the fractures were the result of "very significant trauma to her face" caused by blunt force. The doctor further testified that Childers "was so swollen and bruised," he could not tell whether the injuries had been caused by one punch or multiple punches. Thus, unlike in Roark, the evidence presented in this case shows that the assault was attended with such circumstances of violence and brutality that malice could properly be inferred from the blow with a fist.

Accordingly, Barnes's proffered instruction was an incomplete statement of the applicable law. While it would have correctly informed the jury that malice may not ordinarily be inferred from a blow with a bare fist, it would have neglected to inform the jury that a blow with a bare fist may be attended with such circumstances of violence and brutality that malice may be inferred from it.

We conclude, therefore, that the evidence presented in this case "did not justify giving the instruction in the form offered, and it would have been misleading to the jury." Id. at 641, 166 S.E.2d at 273. Hence, the trial judge did not abuse his discretion in refusing the instruction.

### B. Heat of Passion

Barnes contends the trial judge should have given the jury the proffered instruction on heat of passion because the evidence adduced at trial supports a finding that he wounded Childers in the heat of passion when he returned home and found her in bed with another man. The Commonwealth contends the requested instruction was not applicable to the facts and circumstances of this case because Barnes did not testify that he hit Childers. We agree with the Commonwealth.

"Heat of passion . . . may be founded upon rage, fear, or a combination of both. Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." Barrett v. Commonwealth, 231 Va. 102, 106, 341 S.E.2d 190, 192 (1986)

(citations omitted). Heat of passion "'is the *furor brevis* which renders a man deaf to the value of reason, so that, *although the act done was intentional . . .* , it was not the result of malignity of heart, but imputable to human infirmity.'" Belton v. Commonwealth, 200 Va. 5, 9, 104 S.E.2d 1, 5 (1958) (second emphasis added) (quoting Brown v. Commonwealth, 86 Va. 466, 473, 10 S.E. 745, 747 (1890)); see also Hodge v. Commonwealth, 217 Va. 338, 345, 228 S.E.2d 692, 697 (1976) (noting that the issue of heat of passion arises only after there is "a prima facie showing that malice exists" (emphasis omitted)); Williams, 13 Va. App. at 398, 412 S.E.2d at 205 ("Malice inheres in the *intentional doing of a wrongful act* without legal justification or excuse." (emphasis added)). Thus, Barnes was entitled to a heat of passion instruction if the record contains affirmative evidence showing that Barnes intentionally wounded Childers and that the wounding was done in the heat of passion. See generally Hughes v. Commonwealth, 43 Va. App. 391, 403, 598 S.E.2d 743, 748 (2004) ("In evaluating whether the trial court erred in failing to grant an instruction, the appellate courts review the record for 'affirmative evidence' that supports the instruction, rather than basing the review upon 'the jury's ability to reject evidence . . . .'" (quoting Vaughn, 263 Va. at 37, 557 S.E.2d at 223)). Conversely, Barnes was not entitled to a heat of passion instruction if the record reveals the issue of heat of passion was not properly raised by the evidence.[3] See Rhodes v. Commonwealth, 41 Va. App. 195, 200, 202, 483 S.E.2d 773, 775-76 (2003) (holding that a jury instruction on heat of passion is properly refused if it is not supported by the evidence).

As previously noted, the parties presented very different versions of events. Barnes relies exclusively on his version of events to support his claim of heat of passion. We find, however, no affirmative evidence in Barnes's version of events that suggests that Barnes intentionally

---

[3] Barnes does not argue on appeal, and did not argue at trial, that the doctrine of transferred intent supports the giving of a heat of passion instruction in this case. Accordingly, that matter is not before us here.

- 13 -

wounded Childers. Indeed, Barnes gave no indication at trial that he intentionally hit or otherwise made physical contact with Childers. According to Barnes's testimony, he assaulted the man he found in bed with Childers, but he never testified that he assaulted Childers. Rather, he testified that she somehow got hit when she woke up while he and the other man were tussling. In fact, he stated that he never even saw her get hit. Viewed in the light most favorable to Barnes, this evidence establishes, at most, that Barnes attacked the other man in the heat of passion and, in the course of that struggle, Childers was accidentally hit and wounded. As the trial judge noted, however, Barnes was "not on trial for hitting the other man. He [was] on trial for hitting [Childers] and he [said] he doesn't know what happened to her." Thus, Barnes's version of the events, if believed, supports an acquittal, but it does not support a heat of passion instruction.

Likewise, nothing in the Commonwealth's evidence supports a heat of passion instruction.

We hold, therefore, that the evidence in this case is insufficient, as a matter of law, to support a heat of passion instruction. Accordingly, the trial judge did not abuse his discretion in refusing to give the heat of passion instruction requested by Barnes.

### III. CONCLUSION

For these reasons we affirm the trial court's judgment and Barnes's conviction.

Affirmed.

- 14 -

Benton, J., dissenting.

I concur with the majority's holdings regarding the Batson issue and the inference of malice. I dissent, however, from the holding that approves the trial judge's refusal to instruct the jury on heat of passion. I believe sufficient facts exist from which a jury could conclude Jerry Lamont Barnes struck Andra Childers during a passionate rage provoked by his discovery of her in bed with another man.

It is well settled that a trial judge has a "'duty . . . to instruct the jury[, when requested to do so,] on all principles of law applicable to the pleadings and the evidence.'" Dowdy v. Commonwealth, 220 Va. 114, 116, 255 S.E.2d 506, 508 (1979) (quoting Taylor v. Commonwealth, 186 Va. 587, 592, 43 S.E.2d 906, 909 (1947)). As a general rule, whether an accused acted "in the heat of passion upon reasonable provocation is a jury question." Barrett v. Commonwealth, 231 Va. 102, 106, 341 S.E.2d 190, 192 (1986).

When we review the trial judge's refusal of the jury instruction, we must view the evidence in the light most favorable to Barnes, the proponent of the instruction. Commonwealth v. Cary, 271 Va. 87, 99, 623 S.E.2d 906, 907 (2006). Viewed in this light, the evidence at trial proved Childers received medical treatment at a hospital emergency room on the evening of March 26, 2005, for "significant trauma to her face" caused by blunt force. The medical report indicated Childers's "cheekbone, the jawbone and two bones deeper inside the face were fractured." The doctor who treated Childers testified Childers reported she was "assaulted by male subject, closed fist" the previous day. The doctor also testified he could not recall any other complaints. He further testified the trauma to her face could have been caused by one punch or multiple punches.

According to Barnes's testimony, he and Childers had a romantic relationship and cohabitated in an apartment. When he returned home from work on the night of March 25, he

- 15 -

found Childers asleep in bed with another man who lived in their building. Barnes testified he had earlier spoken to a police officer about this man visiting his apartment and also had told the man to stay away. Barnes explained he became "frustrated" by what he saw. Childers and the man were nude and appeared to be highly intoxicated. Childers had urinated and defecated in their bed. Frustrated, Barnes woke the man and asked him to leave, causing a struggle. Barnes and the man "got locked up or tangled up, fists were flying, open hands were flying." Barnes said Childers "woke up . . . while [he] and [the man] was tussling, [and] some kind of way she got hit" in the bed during the commotion.

Barnes testified the room was "dim and lit from the light on the TV" as these events occurred. Barnes testified he did not see Childers get hit and denied stomping on her face. After the man grabbed his clothes and ran from the room, Barnes talked with Childers, trying to get an explanation, and then left the apartment.

Barnes also testified this altercation occurred a week after another event. On the earlier occasion, he arrived home and found Childers in an embrace with the same man. Childers was intoxicated that night and hugging the man in another apartment where a card game was being held. Barnes said he asked Childers to leave the apartment. He denied having a physical altercation with her that evening.

Although Childers and Barnes described different events, they both testified the events occurred on March 25. Two of the Commonwealth's witnesses contradicted Childers's testimony that she had reported Barnes stepped on her face. Contrary to Childers's testimony and consistent with Barnes's testimony, both the doctor and a police officer testified Childers only reported being punched. The police officer also testified that Childers was in bed when he arrived at her apartment and that blood splatters were on the bed.

During the discussions concerning the appropriate jury instructions, the trial judge removed a definition of heat of passion from the proffered instruction on malice. Denying Barnes's objection to removing heat of passion from the finding instruction, the trial judge ruled the evidence was insufficient to raise an issue of heat of passion. The judge said:

> He assaulted the other man. . . . He's not on trial for hitting the other man. He's on trial for hitting this lady and he says he doesn't know what happened to her. . . .
>
> I don't see any evidence under the Commonwealth's or the defense's case that gives rise--I'm not sure there is even evidence on the Commonwealth's side to give rise to heat of passion, certainly not the defense's.

This view of the evidence fails to account for Barnes's testimony that Childers was injured by blows she received while Barnes fought the man in the bed next to her. The evidence is uncontroverted that Childers suffered injury to her face and that she suffered the injury during a commotion involving Barnes. According to Barnes's testimony, "some kind of way [Childers] got hit" while he was enraged and fighting the man in their bed. Consistent with Barnes's testimony, the doctor testified Childers reported being injured when she was punched. Similarly, the police officer testified Childers told him she had been hit in the face with a fist but did not say Barnes stepped on her or kicked her. The officer's report indicated "Childers stated . . . Barnes . . . had punched her in the face several times with his fist." Also consistent with Barnes's testimony of events, the officer testified that he saw blood splatter on the bed where Childers was sitting in her apartment. Thus, the jury might well have rejected Childers's version of events, believing instead the evidence proving she had not been kicked and believing she was not willing to admit she was in bed with the other man.

On the evidence in the record, the jury could have found that Barnes caused Childers's injuries while in a rage and fighting the man laying next to her or that Barnes intentionally hit Childers in the midst of his rage at seeing her in their bed with another man. Either finding would

raise a reasonable inference supporting the defense theory that Barnes's actions, which caused Childers's injuries, were directed by passion, brought on by rage, rather than reason. See McClung v. Commonwealth, 215 Va. 654, 657, 212 S.E.2d 290, 293 (1975) (noting that rage can support a finding of heat of passion); Brown v. Commonwealth, 86 Va. 466, 473-74, 10 S.E. 745, 747-48 (1890) (holding that "passion . . . is the *furor brevis*, which renders a man deaf to the voice of reason"). In refusing to instruct the jury about heat of passion, the trial judge failed to account for the jury's role in assessing Barnes's testimony that Childers's injury resulted from blows she received while Barnes in an uncontrollable rage fought the man in the bed.

"Where a defendant produces evidence that he acted in the heat of passion, he is entitled to an instruction on the lesser offense of unlawful wounding." Miller v. Commonwealth, 5 Va. App. 22, 25, 359 S.E.2d 841, 842 (1987). Though the trial judge instructed the jury on unlawful wounding, the instructions did not distinguish malice from heat of passion. This omission deprived Barnes of the benefit of a "correct statement of the law," which this Court and the Supreme Court have recognized as "one of the 'essentials of a fair trial.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Dowdy, 220 Va. at 116, 255 S.E.2d at 508); see also Honsinger v. Egan, 266 Va. 269, 274, 585 S.E.2d 597, 600 (2003) ("The purpose of jury instructions 'is to fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them.'" (quoting H. W. Miller Trucking Co. v. Flood, 203 Va. 934, 936, 128 S.E.2d 437, 439 (1962))).

As fact finder, "the jury has wide latitude" in applying the law to the facts. Bradshaw v. Commonwealth, 174 Va. 391, 401, 4 S.E.2d 752, 756 (1939). "A jury, not the trial court, weighs the evidence and assesses the credibility of the witnesses." Barrett, 231 Va. at 107, 341 S.E.2d at 193.

> The jury is not required to accept, *in toto*, either the theory
> of the Commonwealth or that of an accused. They have the right

to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. In so doing, they have broad discretion in applying the law to the facts and in fixing the degree of guilt, if any, of a person charged with a crime.

Belton v. Commonwealth, 200 Va. 5, 9, 104 S.E.2d 1, 4 (1958).

In summary, Barnes and Childers each recounted events that occurred on March 25, albeit different ones, leading to Childers's injury. Barnes was entitled to have the jury instructed on heat of passion because the jury could have concluded his description of events caused Childers to suffer injury. Indeed, in view of the evidence in this record, the jury could have convicted Barnes of malicious wounding, believing he hit Childers and the man in the midst of his rage at seeing her in their bed with the man. Thus, the trial judge improperly rejected the hypotheses that the jury (1) could have accepted Barnes's testimony about the events that precipitated his conduct, (2) could have believed Barnes hit Childers when "some kind of way she got hit," and (3) could have believed from the extent of Childers's injuries that Barnes intentionally hit her.

"[W]hen a principle of law is vital to a defendant in a criminal case, a trial court has an affirmative duty properly to instruct a jury about the matter." Jimenez v. Commonwealth, 241 Va. 244, 250, 402 S.E.2d 678, 681 (1991). Therefore, when, as here, the trial judge refused such an instruction, "[t]he decisive question is not whether the evidence supports the verdict of the jury, but whether under all the facts and circumstances the jury was properly instructed on the pertinent principles of law and, therefore, whether the accused has had a fair and impartial trial." Belton, 200 Va. at 8, 104 S.E.2d at 4. The evidence in this case presented more than a scintilla of independent evidence to support an instruction on heat of passion. Had they been instructed on heat of passion, they could have found that Barnes acted while in that state of mind. By removing the definition of heat of passion from the malice instruction, the trial judge denied Barnes a fair and impartial trial.

- 19 -

For these reasons, I dissent. I would reverse the conviction for malicious wounding and remand for a new trial.