## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫

John Ray Moxley v. Commonwealth of Virginia.

September 10, 1953.

Record No. 4045.

Present, All the Justices.

The opinion states the case.

*S. F. Landreth* and *J. L. Tompkins*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General, Frederick T. Gray, Assistant Attorney General* and *C. F. Hicks, Assistant Attorney General*, for the Commonwealth.

Miller, J., delivered the opinion of the court.

On Sunday, July 15, 1951, about 1:30 o'clock a. m., George Isom was shot and killed by John Ray Moxley in the latter's home. Moxley was indicted for first degree murder, pleaded not guilty, and was tried before a jury. Self-defense was relied upon as a justification for the killing, but he was convicted of murder in the second degree with punishment fixed at five years confinement in the penitentiary. From the judgment confirming that verdict, a writ of error was awarded.

Accused insists that the evidence, though it be considered in the light most favorable to the Commonwealth, conclusively negatives the existence of malice and at most establishes no grade of homicide greater than that of voluntary manslaughter.

This contention requires that certain circumstances preceding the killing and those attending the homicide, as well as the condition of the premises immediately thereafter be set out in detail.

Accused, his wife, Pauline Moxley, and their three children, the youngest of whom was then a baby, live on the outskirts of the town of Galax. Their home consists of a living room, two bedrooms, kitchen, bath and hall. Within the house there are no hinged doors but curtains are hung over the doorways between the hall and rooms.

Some hours before the homicide accused and his wife decided to drive out several miles to "Atwood's Beer Parlor and Dance Hall." About 9:30 p. m. Pauline Moxley called her sister, Marie Tompkins, at a drug store in Galax where she worked and asked her to come and stay with the children. Marie's hours of employment on that day were from 12 o'clock noon to 11 o'clock p. m., but she agreed to come when she got off from work.

George Isom was at the drug store when accused's wife called Marie. He was considerably under the influence of intoxicants, and when Marie told him where she was going and that because of his intoxication she would not keep a date with him that they had previously made, he became incensed. When she left work, over her objections he ac-

companied her in the taxi, and while on the way to Moxley's he became more angry, insisted that she had a date with some other person, engaged in an argument with the cab driver, struck at him and hit her.

Upon arrival at the Moxley home a few minutes after 11 p. m. Marie informed her sister in the presence of Isom that he had accompanied her over her protests and "he got more angry * * * ." She then left Isom on the porch and went into the house and to the bedroom which Moxley, his wife and baby occupied. The other two children were asleep in their room across the hall. At this time accused and his wife were ready to go to Atwood's, which was some miles distant, and as they left, Pauline Moxley invited Isom to accompany them. Upon arrival at Atwood's the three partook of bottles of beer. When they left for home it was about one o'clock a. m., and on the way back Isom proclaimed his affection for Marie and insisted that he had to see her that night. The Moxleys reminded him that it was late and undertook to take him home. To do so it was necessary, as they neared Galax, to pass their residence. When Isom noticed that accused had not turned into the road to the Moxley home and realized that they had proceeded some half a mile beyond that turn, he protested and insisted on seeing Marie. Accused testified that he was insistent and, "With a hardness in his voice * * * as though he were getting angry, he said, 'This will never do, Ray. I have got to see Marie.'" Accused realized that there would be trouble if he did not comply with Isom's demand so he drove back to his home.

The house was locked and when Pauline Moxley knocked, Marie got out of bed and came to the door clad in her night clothes to admit them. She immediately returned to the bedroom, followed by Pauline Moxley, who was considerably intoxicated. Marie went back to bed and accused's wife lay down on the foot of the bed and immediately fell into deep slumber.

Though the homicide occurred in this bedroom, there is no eyewitness to the actual killing other than accused.

Pauline was definitely intoxicated and did not awaken from her deep and drunken slumber, and though Marie Tompkins heard, saw and testified to certain circumstances and events that immediately preceded the fatal shots, she had picked up the baby from its bed and fled to the bathroom a moment before the shots were fired.

Accused gives the following account of what immediately preceded the killing and what was happening when he secured the pistol and shot deceased. He says that he and Isom went into the living room for a moment and then he, accused, went to the bedroom to put on his slippers. He there asked Marie if she "was going to see George" and she replied that she would not and to call a cab for him. Accused thereupon returned to the living room and offered to drive Isom home. About that time Marie came to the door and told deceased that it was too late for her to see him or to go anywhere that night, and she then returned to the bedroom. Deceased made no move to go and accused undertook to use the phone to call a cab. Isom thereupon ordered Moxley to desist by saying, "None of that, put that damn phone down." As he made that demand he stepped over and jerked the phone away from Moxley. Accused then said to him, "George, you will have to leave." Isom replied, "I will leave when I get God damn good and ready. I am going to see Marie."

Accused then started into the bedroom to inquire again of Marie if she would see Isom. As he went through the curtains, he was struck by Isom with his fist. The blow knocked him against a plyboard wardrobe that stood slightly to the right of the entrance and he fell almost to the floor. To protect himself he struck back at Isom and hit him. Isom then struck Moxley the second time and that blow knocked accused to the floor in a narrow area between his bed and the baby's bed. He thus described what happened as he attempted to arise from the floor:

"A. He came at my throat. I got up somehow. I grabbed his wrists. I kept him from getting his hands on my throat. He broke loose. He tried it again. I struggled

with him and his arms went up over his head. I could feel the cold sweat on his wrists and I could see his face good. The meanest look I ever saw in a man's face. He had gone mad. I knew if he got those hands on my throat he would strangle me to death. He broke loose again and drove back at me and he drove me hard against the chest. I grabbed his wrists and as he drove back, my back was hurt. I realized I was against the chest from the pain that I got in my back. I remembered the gun in the drawer. To live I had to get that gun. I struck him and he staggered back down the aisle. I got the drawer open. I grabbed the gun and I was scared to death. I knew that he would be on me. I swung myself as fast as I could to the right, and as fast as I could I swung the pistol and shot until he quit attacking me."

Accused then promptly called the officers, and when they arrived informed them that it had been necessary for him to shoot deceased to save his own life. Police Officer Homer Chrisley, in reciting what Moxley told him, said:

"He told me he attacked him in his bedroom and he shot him. Said he had to shoot him."

After testifying that Moxley told him of the scuffle with deceased and that he got the pistol "out of drawer," Sheriff C. I. Jackson gave the following account of what the accused said was happening when he fired:

"Q. And that is the place Mr. Moxley told you he got the gun?

"A. Yes sir, got it out of the drawer.

"Q. They had had it for some Peeping Tom?

"A. Yes sir.

"Q. Mr. Isom coming on him, being in a scuffle and reaching for him, trying to choke him when he went to shooting?

"A. Yes sir, trying to choke him.

"Q. Didn't aim, just went to shooting?

"A As I understand him, said he meant to kill him. Would kill any man that came in his bedroom."

The testimony of Marie Tompkins concerning the events immediately preceding the pistol shots is as follows: She came to the living room door and told Isom that she would not see him and to get a taxi and go home, and that she immediately returned to the room where the baby and Pauline Moxley were asleep. She then heard Isom tell Moxley "to put down the damn phone." Shortly thereafter accused came through the curtains to the bedroom, and as he did so Isom struck him and knocked him almost down. The two men then engaged in a tussle and struck each other, and in such encounter accused was knocked to the floor in the area between the bed on which she was lying and the baby's bed. She describes that part of the encounter thus:

"A. * * * George hit Ray and knocked his glasses off. I think his glasses scratched his nose. I noticed blood on Ray's face. Ray was stooped down there and I don't know whether he was looking for his glasses or what, but I saw George coming towards his throat. Ray looked up, throwing his hands back and trying to get up. That is when I taken the baby out of the bed and left the room."

A moment after she reached the bathroom she heard three pistol shots fired in rapid succession, and after a momentary pause, a fourth shot was fired. When she heard accused's "footsteps coming out in the hall," she left the bathroom and found deceased lying in the floor with "his feet against the bed and the baby's bed." She knelt beside him and called his name, "George." He answered "Marie" and closed his eyes, and for him time merged with eternity.

Examination of the room by the officers showed that the corner of the plyboard wardrobe standing to the right of the entrance had been bent in and a door broken off, Moxley's glasses were found under the bed close to where he claims he was struck in the face by deceased. There was a scratch across accused's nose and some blood on his face, but the clothing upon neither man was dishevelled. The four empty cartridges ejected by the pistol as it fired were found in the bedroom in front of but somewhat to

the right of the door as one enters the room. It was also shown that the pistol ejects fired cartridges to the right. The post mortem examination disclosed that three bullets had penetrated deceased on his left side. Two had entered the outside of the left arm, one passing through the arm and into the left chest at the top of the eighth rib, the other breaking the bone of the arm and coursing upward through the flesh, in which it lodged. The entrance of the third bullet was in the left flank at the level of the eleventh rib. This bullet ranged upward through the spleen, stomach, liver, and right lung and emerged at the level of the sixth rib on the right side.

There was a mark where the fourth bullet had struck the floor a few inches from where deceased's head rested, and its progress into the flooring indicated that it was shot from a point between deceased and the door to the room.

The coroner, who arrived at accused's home a short time after the officers, said that accused appeared to have had something to drink, but was not intoxicated. But an examination of deceased's stomach showed alcoholic contents sufficient to have rendered him intoxicated at the time of the homicide.

These are the controlling facts and circumstances bearing upon the homicide, and we are called upon to determine whether or not accused can be held guilty of murder in the second degree.

Malice, either express or implied, is of the essence of murder. *Briggs* v. *The Commonwealth*, 82 Va. 554. It is the element that distinguishes it from manslaughter.

" * * * That one word *malice* is the touchstone by which the grade of the offence must be determined. When a homicide is committed in the course of a sudden quarrel or broil, or mutual combat, or upon sudden provocation, and without any previous grudge, the offence may be murder or manslaughter, according to the circumstances of the case. * * * " *Read* v. *The Commonwealth*, 22 Grattan (63 Va.) 924, 937.

In every unlawful killing, if it be unaccompanied by circumstances of palliation, malice is implied from the act of killing, and the homicide is presumed to be murder in the second degree. *Coleman* v. *Commonwealth*, 184 Va. 197, 35 S. E. (2d) 96. However, passion brought on by an unlawful assault may reduce the homicide to manslaughter.

" * * * If, upon being assaulted, the passion of the assaulted person become greatly excited, and under that impulse he kill his assailant, though it be with a deadly weapon, the offence is manslaughter only. Yet should his resistance with a deadly weapon be made in a very cruel manner, not at all justified by the nature of the assault, the inference would be that malice, not passion, impelled the blow making his crime murder." *Briggs* v. *The Commonwealth, supra,* at 565.

"A homicide committed in hot blood, growing solely out of the combat for which a defendant was not responsible, is not murder." *Wilkins* v. *Commonwealth*, 176 Va. 580, 582, 11 S. E. (2d) 653.

Does the evidence as a whole conclusively negative the existence of malice on the part of the accused?

To determine that vital inquiry all the circumstances in evidence must be taken into account, and we may not unreasonably reject evidence that is favorable to accused. We find that deceased came to accused's home intoxicated and in a belligerent state of mind. He was cordially received and treated with courtesy. That did not, however, satisfy him, and at a late hour he unreasonably insisted upon stopping again at accused's home. Though his presence was not desired, accused nevertheless complied with his request or demand to be allowed to speak to Marie Tompkins, and upon her clear but courteous refusal to receive him as a visitor at that late hour, accused again offered to drive him to his home or call a cab to transport him. Thereupon deceased became obnoxious and insistent, struck accused, entered the bedroom and there engaged in a fight. Though accused does not in so many words say that he shot in

heat of passion, he does insist that he was struck two or more times and that the assault was of such nature that he thought it necessary to shoot his assailant to avoid being killed or caused serious bodily harm. That he was insulted, assaulted and struck in his bedroom under most unjustifiable conditions is clearly shown. These facts are established by evidence that we cannot disregard, and it can hardly be thought that this did not arouse Moxley's passion, even if he were not placed in such peril as to justify shooting his assailant.

" * * * The plea of self-defense and of passion, engendered by an unprovoked assault, are not in conflict with each other. *Richardson* v. *Commonwealth, supra.* It is to be expected that one assaulted without provocation will do what appears to be necessary to defend himself. Here Wilkins was knocked across the room and twice knocked down by a stranger. It was an assault which he had no reason to look for. If this be not enough to humiliate and anger one, it is hard to say what would be." *Wilkins* v. *Commonwealth, supra,* at 583.

Yet the Commonwealth contends that the three bullets could not have penetrated the left arm and left side of deceased as they did nor could the course of the one that entered the floor have been such as it was nor the empty cartridges have been ejected and found lying to the right of the door had deceased and accused occupied the respective positions as fixed by Moxley when the fatal shots were fired. It is then contended that this is sufficient to show that the killing did not take place as detailed by accused; and that as he did not assert that he shot in heat of blood under provocation but in self-defense (and failed to establish self-defense), the presumption of murder in the second degree has not been conclusively negatived.

This contention by the Commonwealth and its assertion that the killing did not occur as stated by accused, and thus not in heat of blood, are supported in some degree by part of the physical evidence. Yet this argument fails to

take into account other physical circumstances which unquestionably show that an encounter took place between the men, and it fails to give any weight to the testimony of Marie Tompkins.

It is usually the province of the jury to decide whether or not malice exists in the killing and thus determine the grade of homicide. But when the dominant and controlling facts are not in dispute and the inferences to be drawn therefrom are certain, it often becomes the duty of the trial court to say that malice has not been established.

The killing may not have happened in the identical manner detailed by accused. Yet he is sufficiently corroborated by the testimony of Marie Tompkins, the condition of the room, and the location of deceased's body to show that he fired the fatal shots during or as the immediate result of an unlawful attack made upon him.

Uncontradicted testimony, the previous attitude of the two men toward each other, the setting of the tragedy, and the over-all physical evidence conclusively negative the existence of malice. If the killing was not in self-defense, the extenuating circumstances of this case preclude a finding of any grade of homicide higher than that of voluntary manslaughter. *Thomason* v. *Commonwealth*, 178 Va. 489, 17 S. E. (2d) 374; *Wilkins* v. *Commonwealth*, *supra*.

Whether or not it was necessary to kill in self-defense on the one hand, or whether or not accused fired the fatal shots under grave provocation and in heat of blood on the other hand, are the only questions of fact presented by the evidence.

The judgment complained of will be reversed and a new trial ordered not in conflict with the views herein expressed.

*Reversed and remanded.*