CHARLES BARRETT

V.

COMMONWEALTH OF VIRGINIA

Record No. 850007

March 7, 1986

Present: All the Justices

*S. Earl Griffin (Griffin, Pappas & Scarborough,* on brief), for appellant.

*Russell C. Williams, Assistant Attorney General (William G. Broaddus, Attorney General,* on brief), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

Charles Barrett was charged with malicious wounding, Code § 18.2-51[1], and with the use of a firearm in the commission of

---

[1] Code § 18.2-51 reads in pertinent part as follows:

If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall

malicious wounding, Code § 18.2-53.1. A jury convicted Barrett of both charges and fixed his punishment at 13 years and two years in the penitentiary, respectively. The trial court sentenced Barrett in accordance with the jury's verdict.

In this appeal, we must determine whether the court erred (1) in refusing Barrett's proffered jury instructions relating to the lesser-included offense of unlawful wounding, (2) in refusing to permit Barrett to cross-examine the victim, and (3) in refusing Barrett's requested jury instruction relating to the victim's reputation for violence.

Between 1:00 and 2:00 a.m. on February 23, 1984, Barrett and his friend, Frederick Keene, entered "Dot's Tavern" in Portsmouth. Once seated, the defendant saw the victim (John Gilchrist) and Tony Harris, who had been drinking together in the tavern since about 11:15 p.m. Harris testified he saw Barrett in the tavern, but that no words were exchanged between the defendant and them.

Within a matter of seconds or minutes after arriving, Barrett left the tavern, stating to Keene that he wanted to avoid a potential confrontation with Gilchrist. According to Barrett, "word was on the street that [Gilchrist was] looking for [him]."

Shortly thereafter, as Barrett and Keene were walking away from the tavern on County Street, Gilchrist and Harris began following approximately 10 feet behind them. Harris testified that Barrett turned toward Gilchrist and him and "started talking a little out of his head." According to Harris, Barrett asked why he and Gilchrist were following him and Harris replied, "We ain't got nothing to say to you." Harris stated that after Barrett and Keene stepped aside and he and Gilchrist proceeded by, Barrett "walked up beside [Gilchrist], like in a hurry situation . . . looking crazy."

Barrett gave a slightly different account. He testified that Gilchrist and Harris began walking "right on [their] heels" and using vulgar language. Similarly, Keene testified that Gilchrist began "bad mouthing" Barrett and Keene, and that Gilchrist then initiated an argument with Barrett.

At this moment, a car pulled up beside the group of men, and the driver, Vernon Granderson, offered Barrett a ride. As Barrett

---

. . . be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

turned toward the car, Keene saw Gilchrist "[pull] out a gun," and Keene then yelled to Barrett: "Charles, watch out; he's got a gun." As Keene fled the scene, he immediately heard two shots, and then, minutes later, he heard two more shots.

Granderson, who knows Barrett by the name "Rudy," testified that as he was driving away after realizing an argument was in progress, he heard someone exclaim: "Watch out, Rudy; he's got a gun." Thereafter, Granderson heard two shots "[r]ight behind each other," and thought he may have heard "one or two more shots." Granderson testified that, when he offered Barrett a ride, he could see that Barrett was not holding a gun.

Harris testified that while he was turned toward Granderson's car, he heard a shot fired. When he turned back, Harris saw Gilchrist falling to the ground and Barrett standing in front of Gilchrist with a gun. Harris then fled and did not look back.

Barrett testified that he heard Granderson offer him a ride. As he turned to see the driver, Barrett heard someone shout: "Watch out, Rudy; he's got a gun." Upon hearing this warning, Barrett, who had been carrying a gun "[s]ince the word was on the street that [Gilchrist] was out to get [him]," "swerved and fired" at Gilchrist.

The apparent genesis of the confrontation between Barrett and Gilchrist was a previous fistfight in which Barrett was the victor. Following his defeat, Gilchrist threatened Barrett, stating that their next fight "wouldn't be with fists." Barrett testified that he heard Gilchrist was "looking for [him]" and that he feared Gilchrist because of his reputation for carrying a gun.

The trial court instructed the jury on the crime of malicious wounding, but refused Barrett's request for instructions on the lesser-included offense of unlawful wounding. The court reasoned that the evidence could support only a conviction of malicious wounding or an acquittal by reason of self-defense. Because the mental-state elements of unlawful wounding are the same as those of voluntary manslaughter, we will examine homicide law for a resolution of this issue.

Every malicious homicide is murder. *Wooden* v. *Commonwealth*, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981). Manslaughter, on the other hand, is the unlawful killing of another without malice. *Moxley* v. *Commonwealth*, 195 Va. 151, 77 S.E.2d 389 (1953). To reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of

passion and upon reasonable provocation. *Martin* v. *Commonwealth*, 184 Va. 1009, 1016-17, 37 S.E.2d 43, 46 (1946).

■ Heat of passion is determined by the nature and degree of the provocation, *Wilkins* v. *Commonwealth*, 176 Va. 580, 583, 11 S.E.2d 653, 654-55 (1940), and may be founded upon rage, fear, or a combination of both, *McClung* v. *Commonwealth*, 215 Va. 654, 657, 212 S.E.2d 290, 292 (1975). Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice. *Hodge* v. *Commonwealth*, 217 Va. 338, 345, 228 S.E.2d 692, 697 (1976); *Belton* v. *Commonwealth*, 200 Va. 5, 10, 104 S.E.2d 1, 5 (1958).

■ A plea of self-defense and a claim of provoked heat of passion do not conflict with each other. *McClung*, 215 Va. at 657, 212 S.E.2d at 293; Moxley, 195 Va. at 159, 77 S.E.2d at 394; *Crockett* v. *Commonwealth*, 187 Va. 687, 697, 47 S.E.2d 377, 382 (1948); *Wilkins*, 176 Va. at 583, 11 S.E.2d at 655; *Richardson* v. *Commonwealth*, 128 Va. 691, 695-96, 104 S.E. 788, 790 (1920).

■ Generally, whether a killing was done in the heat of passion upon reasonable provocation is a jury question. *Moxley*, 195 Va. at 160, 77 S.E.2d at 394. "Only when the trial court, giving the defendant the benefit of every reasonable inference from the evidence, can say that the minds of reasonable men could not differ does the question become [one] of law." *McClung*, 215 Va. at 656, 212 S.E.2d at 292.

The Attorney General argues that there was evidence of only one potentially provocative act by Gilchrist—pulling the gun on Barrett. Thus, the Attorney General continues, this act, if believed by the jury, would have established self-defense requiring acquittal. Because the jury may have decided to disbelieve this testimony, the Attorney General contends that Barrett has failed to introduce sufficient evidence of "provocation to support his heat of passion contention." We conclude that the Attorney General's view of the evidence is too narrow and that his argument runs counter to the legal principles stated above.

■ There was ample evidence to support Barrett's theory of unlawful wounding. Gilchrist had threatened the defendant, saying the next time they fought "it wouldn't be with fists." Barrett had heard that Gilchrist "was out to get" him, and believed Gilchrist was carrying a gun for that purpose.

Barrett sought to avoid a confrontation with Gilchrist in the tavern and attempted unsuccessfully to separate himself from Gil-

christ. Nevertheless, Gilchrist and Harris walked "right on [Barrett's] heels" directing vulgar language at him.

While this hostility continued, Barrett momentarily directed his attention to the driver of the car. At this moment, Barrett heard someone exclaim: "Watch out, Rudy; he's got a gun." Barrett reacted by turning and firing his gun at Gilchrist. We conclude, therefore, that a jury reasonably could find from the evidence that Barrett did not act maliciously, but acted upon a reasonable provocation, in the heat of passion induced by fear.

■ A jury, not the trial court, weighs the evidence and assesses the credibility of the witnesses. It is immaterial that the jury might have rejected the lesser-included offense; if there is evidence tending to support the lesser offense, a trial court errs in refusing an instruction thereon. *McClung*, 215 Va. at 657, 212 S.E.2d at 292; *Taylor* v. *Commonwealth*, 186 Va. 587, 591, 43 S.E.2d 906, 908 (1947). Because the jury apparently rejected the evidence tending to support Barrett's claim of self-defense, it does not necessarily follow that it also would have rejected the evidence that Barrett acted in the heat of passion.

> The jury is not required to accept, *in toto*, either the theory of the Commonwealth or that of an accused. They have the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. In so doing, they have broad discretion in applying the law to the facts and in fixing the degree of guilt, if any, of a person charged with a crime.

*Belton*, 200 Va. at 9, 104 S.E.2d at 4 (citations omitted). Thus, we conclude that the trial court erred in refusing to instruct the jury on the lesser-included offense of unlawful wounding. The record indicates that Gilchrist's gunshot wound caused him severe brain injury which has impaired his memory. Nevertheless, the Commonwealth elected to call him as a witness. His entire direct examination was as follows:

Q. Steve, can you tell the jury your full name?
A. No.
Q. Can you say your name?
A. John Gilchrist.
Q. Do you remember being shot?
A. No.

Q. Do you remember anything about what happened to you?

A. No.

Q. Do you know who shot you?

A. No.

Q. Do you have any memory of an injury, or what caused you to not be able to walk or remember?

A. No.

[Commonwealth's Attorney]. That's all I have, Your Honor.

The trial court refused to allow Barrett to cross-examine Gilchrist, ruling that Gilchrist was incompetent to testify. We believe the court erred.

■ Cross-examination, being fundamental to the truth-finding process, is an absolute right guaranteed to an accused by the confrontation clause of the Sixth Amendment. *Shanklin* v. *Commonwealth*, 222 Va. 862, 864, 284 S.E.2d 611, 612 (1981). Although a trial court may exercise discretion to see that the right of cross-examination is not abused, the discretion may be employed only after the right to cross-examine has been fairly and substantially exercised. *Id.*

■ The Attorney General contends that the trial court's determination of Gilchrist's competency is a matter resting within the court's discretion. It is true that a trial judge sometimes may be called upon to make a threshold determination respecting the competency of a witness, but here that threshold had been crossed. Thus, the issue was not one of competency. By offering the witness, the Commonwealth vouched his competency. Apparently, the witness was offered for the purpose of proving that he had no recollection of the incident. Because he testified to that effect, the defendant had an absolute right to cross-examine Gilchrist respecting his memory and all other relevant matters.

■ Finally, Barrett contends the court erred in refusing to admit evidence and to instruct the jury regarding evidence of Gilchrist's reputation for violence and turbulence. Because the record fails to contain a proffer of the evidence sought to be introduced, we cannot consider these alleged errors. *See Wyche* v. *Commonwealth*, 218 Va. 839, 842-43, 241 S.E.2d 772, 774-75 (1978); *Whittaker* v. *Commonwealth*, 217 Va. 966, 968-69, 234 S.E.2d 79, 81 (1977).

■ Because the trial court erred in refusing to instruct the jury on the lesser-included offense of unlawful wounding and in refusing to permit the defendant to cross-examine the victim, we will reverse the conviction of malicious wounding and remand the case for a new trial. Likewise, because the conviction of use of a firearm was contingent upon a conviction of *malicious* wounding,[2] we also will reverse that conviction and remand the case for a new trial.

*Reversed and remanded.*

---

[2] Code § 18.2-53.1 reads in pertinent part:
   It shall be unlawful for any person to use . . . any . . . firearm . . . while committing . . . murder, rape, robbery, burglary, *malicious wounding as defined in § 18.2-51*, or abduction.
(Emphasis added.)