COURT OF APPEALS OF VIRGINIA

Present: Judges Friedman, Raphael and White
Argued at Richmond, Virginia

PUBLISHED

JADEEN KEIVON PERSON

                                              OPINION BY
v.      Record No. 0691-24-2          JUDGE FRANK K. FRIEDMAN
                                              MARCH 24, 2026

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
S. Anderson Nelson, Judge

Meghan Shapiro (Virginia Indigent Defense Commission,[1] on
briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,[2]
Attorney General, on brief), for appellee.

This appeal raises questions involving the inference of malice that arises where a defendant uses a gun in a killing. Here, the defendant asserts that he armed himself under a perceived threat of bodily harm to himself and a family member and that this entitled him to a "right to arm" instruction telling the jury that these circumstances can negate any malice that may be inferred from his use of a gun.

Jadeen Keivon Person was tried for first-degree murder and the use of a firearm in the commission of murder in the Circuit Court of Mecklenburg County. A jury convicted Person of second-degree murder and use of a firearm in the killing. On appeal, Person argues that the court erred by refusing four jury instructions. He also assigns error to the circuit court's admission of

---

[1] Counsel was a Senior Appellate Attorney at the Virginia Indigent Defense Commission at the time of filing. By order entered March 24, 2025, the Court granted her motion to withdraw as counsel and to continue as appellate counsel in a private capacity.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

only 22 minutes of his 2-hour recorded interview with police, the court's admission of statements by out-of-court declarants, and the court's rulings allowing the prosecution to make closing arguments about the Castle Doctrine. Finding the circuit court erred by refusing Person's proposed "right to arm" jury instruction, we reverse and remand.

BACKGROUND

The central focus of this appeal is the trial court's refusal to grant Person's "right to arm" instruction. When reviewing a trial court's denial of a proffered jury instruction, we recite the facts in the light most favorable to the proponent of the denied instruction. *See Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021). Here, that litigant is Person.

*Events on the Night of the Shooting in Best Light to the Defense*

On January 19, 2022, Person called the police after D.J.[3] Williams and Kevin Edmunds—Person's brother—were shot during an altercation in Person's home. Mecklenburg County Sheriff's Deputy Bailey Townsend and South Hill Police Officers Tyler Spillane and James Crawford responded to the call at 613 North Brunswick Avenue; the officers knocked, then entered the home when Person opened the door. Person and his other brother Thomas Person (Thomas) were in the living room when the officers entered. Williams and Edmunds were on the floor with visible gunshot wounds. Williams died at the scene.

Person's name is on the lease of the residence where the incident took place. Prior to this shooting, Person had never been charged or convicted of any crime. In fact, he had previously worked as a correctional officer. At the time of the incident Thomas was living with Person because he had nowhere else to go or live. Another friend, Ramon Rhodes, also lived in Person's home.

---

[3] D.J. was the nickname of the deceased victim, Demarcus Antonio Williams, Jr.

During his testimony at trial, Person recalled that on the night of the incident he had come home from work to find his brothers, Thomas and Edmunds, at his home along with Rhodes and another friend, Fletcher. Person arrived around 10:30 that night after his shift at New Court Steel. He proceeded to take a shower and then went straight to his bedroom, alone, to play video games.

While playing a video game, Person heard a gunshot, at which point he grabbed his legally-owned Glock; he then heard another gunshot, and heard Edmunds calling his name. He testified:

> A. So I'm in the room playing the game. I hear a gunshot. So I get up. I grab my gun. I open the door. It's another gunshot.
>
> Q. Do you hear anything else before you open the door?
>
> A. I hear my brother yelling my name.
>
> Q. All right. Tell us about it.
>
> A. I hear my brother yelling my name, Jaybug. He call me Jaybug. It's my nickname.
>
> . . . .
>
> A. Jaybug, I been shot, Jaybug, I been shot. So when I hears that I run to the living room.

Person arrived in the living room to find a man, D.J. Williams, wrestling with Edmunds for a gun:

> A. So I rush to the living room. I see the victim overtop of my brother wrestling for the gun. So I see my brother, like, losing. So I see my brother kicks him off. And right then and there before, you know, he can get the gun I react and then shot the victim.

Person testified that he was "scared" and "afraid" for his own life and his brother's life when he fired. Moreover, he indicated the gun was within reach of Williams when he fired and that he already knew his brother had called out that he had been shot.

After police arrived, Person's brother, Edmunds, was rushed by rescue services to a local hospital where he died of his gunshot wound.

Person acknowledged at trial that he did not tell the investigating officers what had really happened on the night of the shooting because he did not think they would believe him. Person testified that he subsequently willingly went to the police in July because his "conscience [was] messed up. Couldn't eat. Couldn't sleep." Even so, Person stated that he still did not tell the detectives what happened initially at the meeting in July because he was still scared of the consequences.[4]

Person ultimately told the police that he was alone in his room playing video games when the shooting began and he stated that it was not his "intention to kill anybody"; he was trying to defend his brother and himself from a threat of grave violence. When he was asked how many times he shot Williams, Person admitted that he did not know the exact number. Again, Person insisted he simply intended to "protect [himself] and [his] brother."

*The Rest of the Story*

The Commonwealth's evidence established that Thomas and Williams were acquaintances. Text messages between the two from the day of the shooting revealed that Thomas asked Williams to bring some marijuana by the house that evening.

Montavius Royal was with Williams the night he went to Person's house. Williams told Royal he "had a play" in South Hill, which could mean "going to see a girl or sell drugs." Williams had a red bookbag with him. Williams and Royal arrived at Person's home, entered, and Royal asked for something to drink. A third man stayed with the car. Royal testified that "somebody came from behind the curtain, [and said] like give that shit up for a [n*****]" about 40 to 60

---

[4] At trial, the prosecution played the first 22 minutes of this interview—generally the portion before Person became more candid about the night's events. The remainder of the interview is not in the record. Person contends that the trial court erred by not admitting the rest of the interview into evidence.

seconds after they arrived. Royal testified that the assailant had a "big gray [gun] with a long clip hanging out of it." Williams subsequently reached for his gun and fired it.

Royal ran for his life, breaking the glass in the front door in the process and cutting his wrist. Royal sprinted to the car and yelled that someone "just shot D.J." Royal heard more gunshots as he fled for help. Royal's description of the alleged assailant matched the clothing Edmunds was wearing that night.

Katrina Newsome, Williams' mother, received a telephone call from a relative saying that her son "was being held at a house in South Hill by some guys," that Williams "had been shot," and that "they wouldn't let him out." A short time later, Williams' car arrived at the house and two men exited. They were "frantic" and said that "some guys had [Williams] in a house in South Hill and they wouldn't let him out."[5] Newsome called the police.

The police recounted that Person and his brother Thomas were in the living room when the officers entered and the two gunshot victims, D.J. Williams and Kevin Edmunds, lay on the floor. Edmunds was still alive, suffering from a single gunshot wound to the abdomen. Williams was not breathing. Roommate Ramon Rhodes and Fletcher were in a room down the hall. Officers swabbed Person's, Thomas', Fletcher's, and Rhodes' hands for gunshot residue. Williams' hands were swabbed at the medical examiner's office.

The officers learned that Person had a Smith & Wesson and a Canik "pistol-style" firearm on a bedside table in his bedroom, with an extended magazine loaded with 9mm ammunition. Thomas said he had moved the firearms from the living room where Williams' body was to Person's bedroom. When officers announced they were going to search the house,

---

[5] These statements comprised the "out of court" declarations that Person contends were wrongly admitted in evidence. The utterances were used to support claims of an abduction— which could lay the groundwork for a first-degree murder verdict based on a killing in the course of an abduction. *See* Instruction 15.

Person privately told the officers that there was a third firearm, a Glock 19 9mm pistol, hidden in his closet on a top shelf inside a Gatorade box.

Detectives obtained a search warrant for the house. The search yielded a red bookbag (containing 12 plastic bags of marijuana, 5 empty plastic bags, as well as a digital scale) from Thomas' bedroom closet. This was, presumably, the red bookbag Williams arrived with. The officers also found a projectile on the floor of the bedroom which had passed through the wall from the living room and hit a television. They found a 9mm Sig brand casing under Williams' body and a spent T&M brand 9mm casing under the sofa in the living room. Officers further found a Taurus GTC 9mm handgun in another bedroom. Finally, a Canik 9mm handgun registered to Williams was found with an empty cartridge in the chamber; it "appeared that the gun had jammed."[6]

Williams' mother, Newsome, gave police Facebook and text messages between Williams and Thomas from the night of the shooting from Williams' phone. These messages confirmed that Thomas had asked Williams to bring marijuana to his house. Thomas had cautioned Williams about not parking in front of the house because "people right there be tripping."

As noted above, detectives formally interviewed Person in July for approximately two hours. Detective Crawford told Person that he was not under arrest and that he had waited to interview him until the forensic results were returned. Person's initial statements in this interview were inconsistent with his trial testimony. He initially denied shooting Williams. Eventually, however, Person admitted that he had grabbed the Glock when he heard gunshots and left his room. After the interview, Person was charged with the murder of Williams and the use of a firearm in the commission of a murder.

---

[6] Ten casings, one projectile, and the firearms were submitted to the Department of Forensic Science for analysis, along with the collected gunshot-residue samples from each of the men.

Assistant Medical Examiner Dr. Crystal Van Dusen described Williams' multiple gunshot wound injuries identified during the autopsy. She testified that Williams suffered gunshot wounds to his chest, leg, and back that caused extensive internal injuries. The wounds caused significant internal bleeding. Dr. Van Dusen recovered three projectile fragments associated with specific entrance wounds and additional fragments not linked to specific wounds. The forensic evidence revealed that six of the projectiles retrieved during Williams' autopsy were fired from the Glock 9mm Luger handled by Person, and one projectile was fired from the Smith & Wesson 9mm Luger pistol, handled by Edmunds. The bullet retrieved from Edmunds' autopsy was fired from Williams' Canik 9mm Luger pistol.

*Incidents of Trial*

The Commonwealth's evidence suggested that Williams had arrived to sell marijuana; Edmunds tried to rob him—and Williams and Edmunds shot each other before Person appeared in the living room. Person maintained that Williams was not present when he came home from work and he had no knowledge of Williams' arrival or of Edmund's plan to rob him. Person also denied knowledge that Williams, like Edmunds, had been shot before Person entered the room. Person contended that he simply left his room, after hearing the gunshots and Edmund's cry that he had been shot, and arrived in the living room to find a man standing over his brother.

Person does not challenge the sufficiency of the evidence. He does assert that several significant errors in procedure occurred during the trial.

*Instructions Challenged by Person*

The Commonwealth requested and received Instruction 19:

> You may, but are not required, to infer malice from the deliberate
> use of a deadly weapon unless, from all the evidence, you have a
> reasonable doubt as to whether malice existed.

To countervail the inference of malice in Instruction 19, Person tendered Instruction A, which stated:

> A person who reasonably believes that another intends to attack him or another for the purpose of killing him or another or doing him or another serious bodily harm has a right to arm himself for his own necessary self-protection or the protection of another. In such a case, no inference of malice can be drawn from the fact that he armed himself.

The circuit court, however, refused the instruction, noting that it was "not a standard jury instruction" and "from the evidence that was introduced by the defendant that he [Person] didn't know what was going on when he armed himself and came out of the room," the court concluded "this instruction should not be granted." In essence, the court determined that the facts did not support a "right to arm" instruction on this record.

The circuit court did grant a self-defense instruction:

> If you believe that the defendant was without fault in provoking or bringing on the encounter, and you further believe that:
>
> (1) he reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being killed or that he was in danger of great bodily harm; and
>
> (2) he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm, then the killing was in self-defense, and you shall find the defendant not guilty.

*See* Instruction 23. This instruction explains self-defense, but does not reference defense of others. The circuit court granted one "defense of others" instruction:

Instruction No. E

> The law pertaining to defense of others is that one may avail himself or herself of the defense only where he or she

reasonably believes, based on the attendant circumstances, that the person defended is without fault in provoking the fray.

The court declined to grant several other instructions sought by Person.[7]

*The Police Interview Recording*

After extensive argument, and over Person's objection, the circuit court ruled that the prosecution could play for the jury the first 22 minutes of Person's 2-hour recorded interview with Detective Crawford in July 2022. On appeal Person argues "the prosecution was permitted to end the interrogation video at that point, leaving out the remaining 90+ minutes in which [Person] expressed regret, apologies, and an explanation for his initial dishonesty." The remaining portion of the interview was not presented to the jury and was not included in the trial record.

*Admission of Statements by Out-of-Court Declarants and Closing Argument*

Williams' mother made numerous statements incorporating alleged statements from "relatives" and Williams' associates that her son was being held in a house in South Hill. These statements were not objected to contemporaneously, but Person invokes the ends of justice exception to attack the admission of these statements.

Finally, Person claims that the prosecution was wrongly permitted to make a statement in closing argument relating to instructions that were not given:

> In addition to what you're instructed on, there are certain things that you didn't hear anything about that are concepts of law that are not applicable to this case. And amongst them is that you are not entitled to use deadly force within your home in this case

---

[7] Most notably, the court refused the related Instruction D offered by Person:

> One must reasonably apprehend death or serious bodily harm to another before he or she is privileged to use force in the defense of another. The amount of force which may be used must be reasonable in relation to the harm threatened.

automatically. You're not instructed on that. So the fact this happened at the defendant's home is not legally significant.[8]

*Verdict*

The jury returned convictions on second-degree murder as a lesser-included offense to first-degree murder, and use of a firearm during the commission of a murder. The circuit court sentenced Person to 43 years' incarceration, with 23 years suspended. This appeal follows.

ANALYSIS

The pivotal question here is whether the circuit court erred in refusing to give the jury a right-to-arm jury instruction. "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Pena Pinedo*, 300 Va. at 118.

I.  Person Was Entitled to a Right-to-Arm Jury Instruction and the Circuit Court Erred by Not Giving One

On appeal, Person argues the circuit court erred when it denied his proposed Instruction A, a right-to-arm jury instruction, because the instruction was a proper statement of law, supported by the evidence in the case, and was essential due to the circuit court's inclusion of the Commonwealth's instruction on the inference of malice from the use of a deadly weapon. We agree with Person.

A.  Standard of Review

"Both the Commonwealth and the defendant are entitled to appropriate instructions to the jury of the law applicable to each version of the case, provided such instructions are based upon the evidence adduced." *Stewart v. Commonwealth*, 10 Va. App. 563, 570 (1990) (citation omitted). "A defendant is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence." *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990) (quoting

_____

[8] Defense counsel at trial did not seek a Castle Doctrine instruction.

- 10 -

*Frye v. Commonwealth*, 231 Va. 370, 388 (1986)); *see also Hughes v. Commonwealth*, 43 Va. App. 391, 403 (2004) (finding a jury instruction is proper "if supported by more than a scintilla of evidence" (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001))).

"[T]he weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis[.]" *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) (first and second alterations in original) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 412 (1993)).  In determining "whether the trial court erred in failing to grant an instruction, the appellate courts review the record for 'affirmative evidence' that supports the instruction, rather than basing the review upon 'the jury's ability to reject evidence that is uncontroverted.'" *Hughes*, 43 Va. App. at 403 (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 37 (2002)).

"[I]f there is evidence in the record to support the defendant's theory of defense, the trial judge *may not refuse to grant a proper, proffered instruction*." *Lienau v. Commonwealth*, 69 Va. App. 254, 264 (2018) (quoting *King v. Commonwealth*, 64 Va. App. 580, 587 (2015) (en banc)).  "Additionally, '[w]here the conflicting evidence tends to sustain either the prosecution's or defense's theory of the case, the trial judge *must* instruct the jury as to both theories.'" *Id.* (alteration in original) (quoting *King*, 64 Va. App. at 587).

> B.  The Evidence Supported the Instruction and it was a Proper Statement of the Law

During the trial, Person proposed Instruction A, which, as noted above, states:

> A person who reasonably believes that another intends to attack him or another for the purpose of killing him or another or doing him or another serious bodily harm has a right to arm himself for his own necessary self-protection or the protection of another.  In such a case, no inference of malice can be drawn from the fact that he armed himself.

The jury instruction comes from a model jury instruction, but is slightly modified. *See* Model Jury Instrs.—Crim. No. 52.520. The difference in the proposed jury instruction is the addition of the "or another" language, which Person added to support his defense of another theory.

The circuit court stated that, at the time Person armed himself, he had heard the gunshot but "didn't know what was going on." The court suggested that without knowledge of a specific or cognizable threat, Person was not entitled to the instruction.

We do not believe Person needed to fully comprehend the exact nature of the threat in order to "reasonably believe[] that another intended to attack him[.]" *See* Instruction A (Refused). What Person did know was that sudden unexpected gunshots erupted from inside his own home. Person's brother then cried out that he had been shot.[9] Upon hearing gunfire and the cries of his brother, Person testified that he perceived an immediate threat to himself and his brother, armed himself, and moved toward the conflict. Viewed in the best light to Person, we believe this established more than a scintilla of evidence that Person armed himself "for the purpose of being able to defend himself," *Lynn v. Commonwealth*, 27 Va. App. 336, 348 (1998), *aff'd*, 257 Va. 239 (1999) (per curiam), and that he had "reasonable grounds to believe" that a serious threat to his safety "w[ould] be carried into execution," and thus had the "right to arm himself in order to combat such an emergency," *Bevley v. Commonwealth*, 185 Va. 210, 215 (1946).[10]

---

[9] Person testified that he suspected there had been some kind of break-in.

[10] Under the facts of this case, viewed in best light to Person, we also believe the evidence supported including the "or another" language in this instruction given the presence of his brothers in Person's home and the cries from Edmunds that he had been shot. Even if the "or another" language in the instruction were deemed improper, the judgment would need to be overturned because when a "principle of law is materially vital to a defendant in a criminal case, it is reversible error for the trial court to refuse a defective instruction instead of correcting it and giving it in the proper form." *Fishback v. Commonwealth*, 260 Va. 104, 117 (2000) (quoting *Whaley v. Commonwealth*, 214 Va. 353, 355-56 (1973)). Here, under *Bevley*, Person was

- 12 -

In *Bevley*, the defendant attended a party where another guest had become intoxicated and violent. *Id.* at 212. When the guest threatened to disarm another partygoer and shoot Bevley and several others, Bevley retrieved a handgun from his car. *Id.* at 213. Shortly thereafter, an altercation ignited and Bevley shot and killed the guest. *Id.* At trial, Bevley was confronted with the fact that his having consciously and deliberately armed himself could be considered as evidence of a malicious and premediated killing. *Id.* at 213-14. The jury was so instructed. *Id.* Bevley's proffered "right to arm" instruction explaining that a person has a right to arm and defend himself or herself against a perceived attack was refused. *Id.* at 214. Our Supreme Court reversed, holding that Bevley was entitled to an instruction "that one who has been threatened with murderous assaults and who has reason to believe that such assaults will be made, may arm himself for defense and in such case no inference of malice can be drawn from the fact of preparation for it." *Id*. at 215-16 (quoting *State v. Summers*, 188 S.E. 873, 875 (W. Va. 1936)).

As the Supreme Court explained in *Bevley*, whether the accused had reason to believe the threat would be "carried into execution" was a question for the jury; but if that jury is given an instruction as to a presumption of malice from the use of a deadly weapon, "then the accused is entitled *as a matter of law* to have the jury instructed that he has overcome the presumption, if they believe the evidence offered in his behalf." *Id*. at 215 (emphasis added). Similarly, Person, here, was entitled to Instruction A not only because it was a correct statement of law, supported by evidence—but also to counter-balance the Commonwealth's reliance on Instruction 19, introducing the inference of malice through Person's use of a gun.[11]

---

entitled to a right-to-arm instruction where the jury had been instructed that it could infer malice from the mere use of the gun.

[11] The right-to-arm instruction, notably, does not include any language about whether the defendant had the right to *use* his firearm. It simply instructs the jury that they can decline to infer malice from Person arming himself as he was leaving his bedroom—if they believe his testimony that he intended to quell a perceived threat to him and his family.

C.  The Instructional Error was Not Harmless

In general, a non-constitutional error is only harmless when "the evidence of guilt [was] so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the verdict," *Commonwealth v. Kilpatrick*, 301 Va. 214, 217 (2022), and "if the reviewing court can be sure that the error did not influence the jury and only had a slight effect," *Lawrence v. Commonwealth*, 279 Va. 490, 497 (2010).  If we "'cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that [the appellant's] substantial rights were not affected'" and therefore, "the conviction must be reversed."  *Graves v. Commonwealth*, 65 Va. App. 702, 712 (2016) (alterations in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001).

Here, malice was a central issue in Person's case.  It is an element of first-degree and second-degree murder.  *Rhodes v. Commonwealth*, 238 Va. 480, 485 (1989) ("Malice, an essential element of all grades of murder, distinguishes murder from manslaughter." (citing *Moxley v. Commonwealth*, 195 Va. 151, 157 (1953))).  During the trial, the Commonwealth received an instruction informing jurors that they could infer malice from Person's mere use of a deadly weapon.  Person was denied a corresponding instruction to countervail the inference of malice instruction.

As in *Bevley*, the failure to give the instruction here is reversible error, because the jury was informed that it could conclude malice was present because a gun was used, but the jurors received no balancing instruction informing them that Person could overcome this inference with proper evidence.  *Bevley*, 185 Va. at 215.  Indeed, when the Commonwealth is allowed to tell a jury that the law presumes "a person using a deadly weapon to kill another acts with malice" this "throws upon the accused the burden of disproving malice."  *Id.*  As *Bevley* notes, in this circumstance the accused is "entitled as a matter of law to have the jury instructed that he has

overcome the presumption" if the jury believes the accused's evidence that he armed himself for the purpose of defending against a reasonably perceived and serious threat against his safety. *Id.* No other instruction in this case remotely covered Person's ability to arm, without malice, to confront an obvious threat.[12] This defect significantly hindered Person's ability to rebut the presumption of malice advocated by the Commonwealth.

In this context, where jurors were instructed they could infer malice simply from Person's use of a gun, we cannot say that the error could not have affected the verdict. Moreover, the jurors acquitted Person of first-degree murder, but convicted him of second-degree murder. We cannot say the requisite malice required for the second-degree murder verdict had no connection to the instructional error. Accordingly, we remand for a new trial if the Commonwealth be so advised.[13]

II. Additional Matters Relevant to Remand

When a judgment is reversed on a specific ground and remanded for a new trial—and assignments of error remain that relate to issues that are likely to recur in the new trial—it is appropriate for the appellate court to address the issues that will likely arise in the subsequent trial. *Harman v. Honeywell Int'l Inc.*, 288 Va. 84, 95-96 (2014) (considering evidentiary matters that likely would arise on remand where the judgment was reversed on other grounds); *Cain v.*

---

[12] *See Bell v. Commonwealth*, No. 0861-95-2, slip op. at 4, 1996 Va. App. LEXIS 422, at *5 (June 11, 1996) (finding no abuse of discretion for refusing right-to-arm instruction where other instructions "fully covered the self-defense issue," and "[t]he Commonwealth made no contention that malice or criminal intent should be imputed to Bell simply by virtue of his being armed").

[13] On remand, under double jeopardy principles, Person cannot be re-tried for first-degree murder since he was acquitted of that charge below. *Workman v. Commonwealth*, 272 Va. 633, 651 (2006); *see* U.S. Const. amend. V; Va. Const. art. I, § 8; *see also* Code § 19.2-285; *Burks v. United States*, 437 U.S. 1, 11-18 (1978) (holding that double jeopardy precludes retrial only when the appellate court "has found the evidence legally insufficient," and distinguishing such reversals from those based on trial error).

*Lee*, 290 Va. 129, 136 (2015) (same). "By corollary, where an evidentiary issue is unlikely to arise in the same context on remand, the appellate court should decline to reach the sidetrack issue and avoid rendering, essentially, an advisory opinion." *Reston Anesthesia Assocs. v. Bandy*, 86 Va. App. 54, 77 (2025).

The majority of Person's remaining assignments deal with issues that are unlikely to recur on appeal in the same manner presented here.[14]

One additional jury instruction issue is likely to recur. As noted above, the "right to arm" is separate and distinct from the concept of self-defense or the right to defend another. Here, the trial court did grant an instruction dealing with the right to defend others (Instruction E) stating: "one may avail himself or herself of the defense only where he or she reasonably believes, based on the attendant circumstances, that the person defended is without fault in provoking the fray."

This was a correct statement of the law as far as it went; we agree with Person, however, that the instruction, as given, is incomplete.[15] In *Foster v. Commonwealth*, 13 Va. App. 380 (1991), this Court noted that a defense of others instruction must present the dual concepts that

---

[14] Person argues that we should apply the ends of justice exception to determine whether it was error to permit Williams' mother to inject statements by out-of-court declarants regarding an abduction into her testimony. On re-trial the witness may refrain from raising these comments to establish abduction and bolster a first-degree murder claim as Person was acquitted of first-degree murder and cannot be re-tried for it—and, if she does raise them, a contemporaneous objection may be interjected (rendering an "ends of justice" analysis, requested here, unnecessary). Accordingly, we decline to reach the question. Similarly, Person objects to the Commonwealth's use at trial of only 22 minutes of Person's lengthy interview with police—but the rest of the interview is not in the record. On remand, the evidence may be used differently and the record may be expanded to include the full interview; thus, we will not address the matter now. Finally, Person also challenges the Commonwealth's closing argument dealing with the absence of an instruction on the Castle Doctrine. Again, we cannot say whether a Castle Doctrine instruction will be tendered on remand or how the parties may choose to argue their case. Therefore, we decline to reach this issue as well at this juncture.

[15] The Commonwealth has not challenged on appeal the granting of a right to defend others instruction. If the evidence on remand justifies a "defense of others" instruction, the instruction should be a proper statement of law.

the "other" being defended be "free from fault" *and* that the actor hold a reasonable belief that the "other" being defended is in danger of great bodily harm. *Id.* at 382 n.1[16]; *see also Lynn*, 27 Va. App. at 353 ("[O]ne may be justified in using deadly force to defend another person where he or she reasonably believes that the person defended faces an imminent threat of serious bodily harm or death and that such person was not at fault[.]"). With respect to the reasonable belief of harm, this legal principle makes the accused's subjective belief all the more relevant. "A defendant may always act upon reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted." *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978).

Here, the jury was only instructed on the "free from fault" prong, in isolation, and was never told that Person's own perspective of danger to his brother was relevant to his defense-of-others claim. Person's tendered instructions sought to include both requisite prongs. On remand, if a "defense of others" instruction is supported by the evidence, it should embrace both the "free from fault" prong utilized by the trial court *and* the "serious bodily harm" concept sought by Person and discussed in *Lynn*, 27 Va. App. at 353.

## CONCLUSION

For the foregoing reasons, Person's conviction is reversed and the matter is remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*

---

[16] In *Foster*, the proffered instruction failed to address the "without fault" prong and, thus, was properly rejected. 13 Va. App. at 386.